**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| In re:  LAI KIM HA<br>aka LAI K HA, | ) <br> ) <br> ) <br> ) | <br> <br> Chapter 7 <br> |
| Debtor. | ) | Bankr. No. 20-72124-PWB |
| | ) | |
| NATIONWIDE JUDGMENT<br>RECOVERY, INC. | ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | Adversary No. |
| vs. | ) <br> ) | |
| LAI KIM HA<br>aka LAI K HA<br>aka LAIHA, | ) <br> ) <br> ) <br> ) | |
| Defendant. | ) | |

**COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT**

COMES NOW, Nationwide Judgment Recovery, Inc. ("Nationwide"), the Plaintiff and a creditor in the above styled action, by and through counsel, and pursuant to 11 U.S.C. § 523(a)(19) and (a)(2)(A) files this Complaint to Determine Dischargeability of Debts against Defendant Lai Kim Ha aka Lai K Ha aka Laiha ("Defendant") and shows this Court as follows:

**Jurisdiction**

1.      This adversary proceeding is brought in connection with the Defendant's case under Chapter 7, Title 11, Bankruptcy Case Number 20-72124-PWB now pending in this Court.  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §157.  This is a core proceeding.

2.      In accordance with Fed. R. Bankr. P. 7008, Nationwide consents to the entry of final orders and judgments by this Court.  Venue is proper in this Court pursuant to 28 U.S.C. §1409.

3.      Nationwide is a creditor of the Debtor.

### Overview

4.      The relief requested herein arises out of a Final Judgment entered on August 14, 2017 in *Bell v. Disner*, Case 3:14-cv-00091-GCM (W.D.N.C. 2014), referred to collectively herein as the "Judgment."  A true and correct copy of the Judgment is attached hereto as Exhibit "A" and is incorporated herein by reference.

5.      Pursuant to the terms of the Final Judgment, post-judgment interest shall accrue at the rate specified under 28 U.S.C. 1961 from the date of entry until the judgment is paid in full.

6.      The current balance of the Judgment is $81,574.02, which includes interest from the judgment date to the date the Debtor filed her bankruptcy petition.

### Procedural Background of Judgment

7.      On August 17, 2012, the Securities and Exchange Commission filed an action titled *Securities and Exchange Commission v. Rex Venture Group, LLC d/b/a ZeekRewards.com and Paul Burks*, Civil Action No. 3:12-cv-519 (the "SEC Action"), to shut down a Ponzi and pyramid scheme operated by Rex Venture Group, LLC d/b/a www.ZeekRewards.com in which more than 700,000 participants lost over $700 million dollars.

8.      As a result of the SEC Action and ZeekRewards' participants' violation of federal securities law, on August 17, 2012, the Court appointed Kenneth D. Bell as Receiver of the estate of Rex Venture Group, LLC, d/b/a www.ZeekRewards.com, and authorized him to initiate legal proceedings seeking the avoidance of fraudulent transfers, disgorgement of profits, and any other

legal and equitable relief that the Receiver deems necessary to recover RVG's assets for the benefit of the Receivership estate. Matthew E. Orso succeeded Kenneth D. Bell as the Receiver.

9.      The Debtor herein was a Net Winner Class Member in the Ponzi and pyramid scheme operated by Rex Venture Group, LLC d/b/a www.ZeekRewards.com.

10.     As a Net Winner Class Member, Debtor received thousands of dollars from her participation in the ZeekRewards Ponzi scheme. A true and correct copy of the statement showing the Debtor's payments into the Ponzi scheme and her winnings is attached hereto as Exhibit "B" and is incorporated herein by reference.

11.     As a result of the SEC Action, the Receiver filed a clawback action under *Bell v. Disner*, Case 3:14-cv-00091-GCM (W.D.N.C. 2014) to recapture the money paid to the scheme's winners so that it can be returned to the victims. The Complaint asserts claims for violation of the North Carolina Uniform Fraudulent Transfer Act, Common Law Fraudulent Transfer and Construction Trust as a result of the Ponzi scheme that operated in violation of federal securities law.

12.     On June 30, 2016, the Receiver moved for Summary Judgment Against Remaining Named Defendants and Partial Summary Judgment Against the Net Winner Class.

13.     On November 29, 2016, the Court granted the Receiver's Motion for Summary Judgment Against Remaining Named Defendants and Partial Summary Judgment Against the Net Winner Class. A true and correct copy of the Order is attached hereto as Exhibit "C."

14.     In the Order granting the Receiver's Motion for Summary Judgment Against Remaining Named Defendants and Partial Summary Judgment Against the Net Winner Class, the Court found that ZeekRewards operated as a Ponzi scheme in violation of federal securities law

and that the Defendants' transfers in furtherance of the Ponzi scheme were violations of N.C. Gen. Stat. § 39-23.4(a)(1), the North Carolina Uniform Fraudulent Transfer Act.

15.     In the Order Granting the Receiver's Motion for Summary Judgment Against Remaining Named Defendants and Partial Summary Judgment Against the Net Winner Class, attached hereto as Exhibit "C," the Court found that ZeekRewards operated as a Ponzi scheme and the transfers that occurred as a result of the scheme were fraudulent.

16.     On June 27, 2017, the Receiver filed a Motion to Enter Final Judgments Against Net Winner Class Members, which was granted by the Court on August 14, 2017.

17.     Attached hereto as Exhibit "D" is a copy of the Final Judgment entered on August 14, 2017, along with page 52 in the index of Judgments and Amounts.  *See* number 3437 for the specific judgment against the Defendant.

18.     On December 17, 2019, Nationwide Judgment Recovery, Inc. was assigned the full portfolio of judgments obtained against more than 6,700 Net Winners who participated and profited from ZeekRewards.  Attached hereto as Exhibit "E" is a copy of the Assignment of Judgment.

## COUNT 1:  Relief Under 11 U.S.C. § 523(a)(19)

19.     Nationwide incorporates paragraphs 1 – 18 herein.

20.     11 U.S.C. § 523(a)(19) provides that a Chapter 7 discharge does not discharge a debt that is

(A) is for—

(i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or
(ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

4

(B) results, before, on, or after the date on which the petition was filed, from—
(i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;
(ii) any settlement agreement entered into by the debtor; or
(iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

21.    Therefore, 11 U.S.C. § 523(a)(19) precludes dischargeability of a debt if two conditions are met.  It must be proven that (1) the debt is for the violation of securities law or for common law fraud, deceit or manipulation in connection with the purchase or sale of any security, and (2) the debt must be memorialized in a judicial or administrative order or settlement agreement.

22.    The 11th Circuit has held that a debtor's personal culpability in the securities violation is irrelevant, so long as the judgment is for a securities violation.  *See Lunsford v. Process Technologies Servs. (In re Lunsford)*, 848 F.3d 963 (11th Cir. 2017).  If the debtor is a party to the judgment and the judgment is for a securities violation, whether the debtor is the one who violated a securities law is irrelevant.  *Id.* at 968 ("[S]ection 523(a)(19)(A) precludes discharge regardless of whether the debtor violated securities laws as long as the securities violation caused the debt.").

23.    In *Lunsford*, the court held that "text and structure" of the section "unambiguously prevents discharge of debts 'for the violation' of securities laws" and makes no distinction between debts arising as acts of the debtor versus acts of third parties that merely result in liability of the debtor.  *Id.*

24.    As part of her active participation in the ZeekRewards Ponzi scheme, the Defendant made a number of transfers that resulted in her winning a net total of  $58,365.59 and being designated as a member of the Net Winner Class.

25.    The Order Granting the Receiver's Motion for Summary Judgment Against Remaining Named Defendants and Partial Summary Judgment Against the Net Winner Class, attached hereto as Exhibit "C," found the transfers that occurred as a result of the scheme were fraudulent because they were incurred in furtherance of a Ponzi scheme in violation of federal securities law.

26.    The SEC Action that shut down the ZeekRewards Ponzi scheme resulted in the clawback action initiated by the Receiver to recover the fraudulent transfers made as a result of the Net Winners' participation in the scheme.

27.    The Final Judgment against the Defendant Debtor, entered in *Bell v. Disner* on August 14, 2017 and attached hereto as Exhibit "A," is a debt owed by the Defendant Debtor for the fraudulent transfers she received as a result of her participation in the ZeekRewards Ponzi scheme in violation of federal securities law.

28.    Nationwide is entitled to a judgment against the Debtor pursuant to 11 U.S.C. § 523(a)(19) finding the Final Judgment to be non-dischargeable and authorizing Nationwide to pursue collection of same.

29.    In the instant case, it is clear that the judgment held by Nationwide Judgment Recovery, Inc. was a result of the Defendant's fraudulent conduct by her active and knowing participation in a Ponzi scheme that violated federal securities law.

30.    The Defendant cannot re-litigate the amounts of the judgment in bankruptcy court. Prior to the entry of the final judgments in *Bell v. Disner*, there was a dispute period that allowed participants to adjust their balances, object to the settlement and judgments, and negotiate settlements with the Receiver.  While she could have challenged the proposed amounts of the judgment at that time, Defendant chose to remain silent.

31.     It is evident in this matter that both requirements of 11 U.S.C. § 523(a)(19) have been met.  The Judgment the Defendant Debtor is attempting to discharge through her bankruptcy clearly resulted from the violation of securities law and common law fraud, deceit or manipulation in connection with the purchase or sale of any security.  Moreover, this debt is memorialized in the Final Judgments issued against the Debtor in *Bell v. Disner*, attached hereto as Exhibit "A." Therefore, the Judgment should be excepted from discharge.

## COUNT II:  Relief Under 11 U.S.C. § 523(a)(2)(A)

32.     Nationwide incorporates paragraphs 1 – 31 herein.

33.     11 U.S.C. § 523(a)(2)(A) provides that a Chapter 7 discharge does not discharge a debt that is

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
> > (A) *false pretenses, a false representation, or actual fraud*, other than a statement respecting the debtor's or an insider's financial condition (emphasis supplied).

34.     Therefore, for a debt to be nondischargeable under 11 U.S.C. § 523(a)(2)(A), it needs to be for money obtained by false pretenses, a false representation, or actual fraud.

35.     The Supreme Court recently explained that fraudulent transfers made with wrongful intent constitute "actual fraud," thereby prohibiting discharge in bankruptcy.  *Husky Int'l Electronics, Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).

36.     In *Husky*, the Court held that "[t]he term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected *without* a false representation."  *Id.* (emphasis added).

37.     The *recipient* of a fraudulent transfer, with the requisite intent, also commits fraud and obtains money or assets by mere participation in the fraud.  If the recipient of a fraudulent

transfer later files for bankruptcy, any debts that can be traced to the fraudulent conveyance will be nondischargeable under § 523(a)(2)(A). *Husky*, 136 S. Ct. at 1589.

38.    In this case, Defendant Debtor willingly participated in an illegal Ponzi scheme which resulted in her receiving transfers totaling $58,365.59 (*see* Exhibit "B"), at the expense of hundreds of thousands of  participants who collectively lost over $700 million dollars.   Her winnings were significant enough to designate her a member of the Net Winner Class, sued by the Receiver in the clawback action of *Bell v. Disner*, Case 3:14-cv-00091-GCM (W.D.N.C. 2014) and ordered to return the fraudulently-transferred funds.

39.    The Defendant-Debtor was aware she was committing a fraudulent act by her active participation in the ZeekRewards scheme.  She "invested" just $10,594.00 in the Ponzi scheme and "won" $68,95959, resulting in net winnings of $58,365.59 in a period of just nine months.  *See* Exhibit B, attached hereto.

40.    A Ponzi scheme is fraudulent by definition: "a fraudulent investment plan in which the investments of later investors are used to pay earlier investors, giving the appearance that the investments of the initial participants dramatically increase in value in a short amount of time." *See* https://legal-dictionary.thefreedictionary.com/Ponzi+Scheme.

41.    The Order Granting the Receiver's Motion for Summary Judgment Against Remaining Named Defendants and Partial Summary Judgment Against the Net Winner Class, attached hereto as Exhibit "C," found the transfers that occurred as a result of the ZeekRewards Ponzi scheme were fraudulent.

42.    Transfers made in furtherance of a Ponzi scheme are presumed to have been made with the intent to defraud.

43.     The Defendant Debtor received transfers as a result of her participation in the ZeekRewards Ponzi scheme with an intent to defraud.

44.     The Defendant Debtor knew at the time of her participation in the ZeekRewards Ponzi scheme that she was committing actual fraud.

45.     Therefore, the Defendant Debtor's Judgment, attached hereto as Exhibit "A," should be found nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

WHEREFORE, Nationwide Judgment Recovery, Inc. prays as follows:

(a)     That the debt represented by the Defendant's Judgment be determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(19); and

(b)     That the debt represented by the Defendant's Judgment be determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A); and

(c)     For any other such relief as the Court may deem appropriate.

This 8th day of March, 2021.

By:     /s/ Howell A. Hall
        Howell A. Hall  GA Bar #318750
        LOGS LEGAL GROUP LLP
        211 Perimeter Center Parkway, NE
        Suite 300
        Atlanta, GA  30341
        Telephone: (770) 452-2819
        Email: hohall@logs.com
        Attorneys for Plaintiff Nationwide Judgment
        Recovery, Inc.

**BELL v. DISNER, Case No. 3:14-cv-91**

**FINAL JUDGMENT**

In accordance with the Court's Order Granting Entry of Final Judgment Against Certain

Net    Winner    Class    Members,    Final    Judgment    is    hereby    entered    against

Defendant **LAI K HA** in the amount of **$78,382.12** which is comprised of  $58,365.59

in   net   winnings   from   the   ZeekRewards   scheme   and   $20,016.53   in   prejudgment

interest.    Post-judgment   interest   shall   accrue   on   the   total   amount   of   this   Judgment,

including   prejudgment   interest,   at   the   rate   specified   under   28   U.S.C.   §   1961   from   the

date of entry of this Judgment until paid in full.

Certified to be a true and
correct copy of the original
U.S. District Court
Frank G. Johns, Clerk
Western District of N.C.
By: ~~Bittillugckunl~~
Deputy Clerk
Date 7\15\2020

**EXHIBIT A**

According to the records of Rex Venture Group, LLC, and other related information, the "net winnings" of Lai K Ha are $58,365.59 determined as follows:

| | | a | | | b | | | | | c = (b - a) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **Cash Paid In** | | | **Commission Payments** | | | | | |
| **Date** | **Username** | **Bid Purchases** | **Subscription Payments** | **Total** | **RPP "Profit Share"** | **Non-Subscription Matrix Payment** | **Subscription Matrix Payments** | | **Total** | **Net Winnings** |
| 12/16/2011 | LAIHA | $ - | $ 99.00 | $ 99.00 | $ - | $ - | $ - | $ - | $ (99.00) |
| 12/20/2011 | LAIHA | $ 2,000.00 | $ - | $ 2,000.00 | $ - | $ - | $ - | $ - | $ (2,000.00) |
| 12/24/2011 | LAIHA | $ 3,000.00 | $ - | $ 3,000.00 | $ - | $ - | $ - | $ - | $ (3,000.00) |
| 1/5/2012 | LAIHA | $ 5,000.00 | $ - | $ 5,000.00 | $ - | $ - | $ - | $ - | $ (5,000.00) |
| 1/21/2012 | LAIHA | $ - | $ 99.00 | $ 99.00 | $ - | $ - | $ - | $ - | $ (99.00) |
| 1/30/2012 | LAIHA | $ - | $ - | $ - | $ 298.40 | $ - | $ - | $ 298.40 | $ 298.40 |
| 2/18/2012 | LAIHA | $ - | $ 99.00 | $ 99.00 | $ - | $ - | $ - | $ - | $ (99.00) |
| 2/20/2012 | LAIHA | $ - | $ - | $ - | $ 214.50 | $ - | $ - | $ 214.50 | $ 214.50 |
| 3/19/2012 | LAIHA | $ - | $ - | $ - | $ 3,015.06 | $ - | $ - | $ 3,015.06 | $ 3,015.06 |
| 3/26/2012 | LAIHA | $ - | $ - | $ - | $ 3,029.95 | $ - | $ - | $ 3,029.95 | $ 3,029.95 |
| 4/1/2012 | LAIHA | $ - | $ 99.00 | $ 99.00 | $ - | $ - | $ - | $ - | $ (99.00) |
| 4/2/2012 | LAIHA | $ - | $ - | $ - | $ 2,705.55 | $ - | $ - | $ 2,705.55 | $ 2,705.55 |
| 4/9/2012 | LAIHA | $ - | $ - | $ - | $ 1,946.07 | $ - | $ - | $ 1,946.07 | $ 1,946.07 |
| 4/23/2012 | LAIHA | $ - | $ - | $ - | $ 497.22 | $ - | $ - | $ 497.22 | $ 497.22 |
| 4/30/2012 | LAIHA | $ - | $ - | $ - | $ 602.60 | $ - | $ - | $ 602.60 | $ 602.60 |
| 5/7/2012 | LAIHA | $ - | $ - | $ - | $ 3,206.87 | $ - | $ - | $ 3,206.87 | $ 3,206.87 |
| 5/14/2012 | LAIHA | $ - | $ - | $ - | $ 2,709.19 | $ - | $ 61.80 | $ 2,770.99 | $ 2,770.99 |
| 6/4/2012 | LAIHA | $ - | $ - | $ - | $ - | $ 5,925.84 | $ - | $ 5,925.84 | $ 5,925.84 |
| 6/17/2012 | LAIHA | $ - | $ 99.00 | $ 99.00 | $ - | $ - | $ - | $ - | $ (99.00) |
| 6/18/2012 | LAIHA | $ - | $ - | $ - | $ 2,987.17 | $ - | $ - | $ 2,987.17 | $ 2,987.17 |
| 6/25/2012 | LAIHA | $ - | $ - | $ - | $ 2,638.87 | $ - | $ - | $ 2,638.87 | $ 2,638.87 |
| 7/2/2012 | LAIHA | $ - | $ - | $ - | $ 4,706.67 | $ - | $ - | $ 4,706.67 | $ 4,706.67 |
| 7/9/2012 | LAIHA | $ - | $ - | $ - | $ 5,533.21 | $ - | $ - | $ 5,533.21 | $ 5,533.21 |
| 7/16/2012 | LAIHA | $ - | $ - | $ - | $ 3,265.13 | $ - | $ - | $ 3,265.13 | $ 3,265.13 |
| 7/21/2012 | LAIHA | $ - | $ 99.00 | $ 99.00 | $ - | $ - | $ - | $ - | $ (99.00) |
| 7/23/2012 | LAIHA | $ - | $ - | $ - | $ 3,697.64 | $ - | $ - | $ 3,697.64 | $ 3,697.64 |
| 7/30/2012 | LAIHA | $ - | $ - | $ - | $ 10,657.07 | $ - | $ - | $ 10,657.07 | $ 10,657.07 |
| 8/6/2012 | LAIHA | $ - | $ - | $ - | $ 11,180.78 | $ - | $ - | $ 11,180.78 | $ 11,180.78 |
| 8/12/2012 | LAIHA | $ - | $ - | $ - | $ 80.00 | $ - | $ - | $ 80.00 | $ 80.00 |
| **Total** | | $ 10,000.00 | $ 594.00 | $ 10,594.00 | $ 62,971.95 | $ 5,925.84 | $ 61.80 | $ 68,959.59 | $ 58,365.59 |

**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14CV91

| | | |
|---|---|---|
| KENNETH D. BELL, in his capacity as a court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| TODD DISNER, in his individual capacity and in his Capacity as trustee for Kestrel Spendthrift Trust; TRUDY GILMOND; TRUDY GILMOND, LLC; JERRY NAPIER; DARREN MILLER; RHONDA GATES; DAVID SORRELLS; INNOVATION MARKETING, LLC; AARON ANDREWS; SHARA ANDREWS; GLOBAL INTERNET FORMULA, INC; T. LEMONT SILVER; KAREN SILVER; MICHAEL VAN LEEUWEN; DURANT BROCKETT; DAVID KETTNER; MARY KETTNER; P.A.W.S. CAPITAL MANAGEMENT LLC; LORI JEAN WEBBER; and a Defendant Class of Net Winners in ZEEKREWARDS.COM, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the Court upon the Receiver's Motion for Summary Judgment

Against Remaining Named Defendants and Partial Summary Judgment Against the Net Winner

Class.  The matter is fully briefed and ripe for consideration.

## I.    FACTUAL BACKGROUND AND UNDISPUTED FACTS

### A. Procedural History of the SEC Action and this Litigation

This "clawback" litigation was initiated by the Receiver of Rex Venture Group, LLC

("RVG"), a Nevada limited liability company with its former principal place of business in

Lexington, North Carolina.  The Complaint alleges as follows:  Paul Burks, the owner and

former top executive of RVG, and other management insiders used RVG in their operation of a

1

**EXHIBIT C**

massive Ponzi and pyramid scheme through ZeekRewards ("Zeek") from at least January 2011 until August 2012. Compl. at ¶¶ 1, 6–9. Over 700,000 participants lost over $700 million dollars in the scheme. *Id.* at ¶ 1. Burks and the management insiders used ZeekRewards to promise substantial payouts and outsize returns to all participants, but few actually benefitted. *Id.* at ¶ 2. Those who did benefit were paid not with profits from a legitimate retail operation, but rather from money paid in by later investors in the scheme.  *Id.* at ¶ 3.  The largest "net winners" (those who received more money from Zeek than they paid in to Zeek) each received well over a million dollars, and many others received hundreds of thousands of dollars. *Id.* at ¶¶ 2, 12–25.

On August 17, 2012, the Securities and Exchange Commission filed an action in this Court, *Securities and Exchange Commission v. Rex Venture Group, LLC d/b/a ZeekRewards.com and Paul Burks*, Civil Action No. 3:12-cv-519 (the "SEC Action"), to obtain injunctive and monetary relief against Paul Burks, shut down the ZeekRewards Ponzi and pyramid scheme, freeze RVG's assets, and seek appointment of a Receiver for RVG. *Id.* at ¶ 26. Also on August 17, RVG, through Burks, admitted to this Court's jurisdiction over RVG and the subject matter of the SEC action, and it consented to entry of judgment in favor of the SEC. *SEC Action*, Doc. No. 5 at ¶¶ 1–2. As a result, the Court entered consent judgments against RVG and Burks enjoining them from violating the federal securities statutes or participating in, or facilitating, the solicitation of any investment in any security or in the offering of a security. *SEC Action*, Doc. Nos. 6, 8.

That same date, in an Agreed Order Appointing Temporary Receiver and Freezing Assets of Defendant Rex Venture Group, LLC (the "Agreed Order"), this Court appointed Kenneth D. Bell as the Receiver over the assets, rights, and all other interests of the estate of Rex Venture Group, LLC, d/b/a www.ZeekRewards.com and its subsidiaries and any businesses or business

2

**EXHIBIT C**

names under which it does business (the "Receivership"). Compl. at ¶ 27. The Order authorized

and directed Mr. Bell as RVG's Receiver to institute actions and legal proceedings seeking the

avoidance of fraudulent transfers, disgorgement of profits, imposition of constructive trusts and

any other legal and equitable relief that the Receiver deems necessary and appropriate to

preserve and recover RVG's assets for the benefit of the Receivership Estate. *Id.* Within 10 days

of his reappointment on December 4, 2012, the Receiver filed the original Complaint and Agreed

Order in the SEC Action in all of the United States District Courts pursuant to 28 U.S.C. § 754

giving this Court jurisdiction over RVG's property in every federal district.[1]

The Receiver filed this clawback action on February 28, 2014, asserting claims of relief

against Defendants for: (1) Fraudulent Transfer of RVG Funds in Violation of the North Carolina

Uniform Fraudulent Transfer Act ("NCUFTA"); (2) Common Law Fraudulent Transfer; and (3)

Constructive Trust. Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1)(A) and (B),

the Receiver moved on July 30, 2014 to certify a defendant class consisting of all persons or

entities who were "Net Winners" in ZeekRewards in an amount in excess of one thousand

dollars ($1,000) (the "Net Winner Class").[2] *See* Doc. No. 68. Net Winner Class members are

defined as those ZeekRewards participants who received more money from RVG/ZeekRewards

(as "profit payments," "commissions," "bonuses" or any other payments) than was paid in to

RVG/ZeekRewards for the purchase of "bids," monthly "subscriptions," "memberships," or

other fees. Each of the named Defendants in this action won in excess of $900,000 (either

---

[1] This Court has previously ruled that the Receiver has standing to bring the claims asserted against the Defendants and this Court has subject matter jurisdiction over this action and personal jurisdiction over the Defendants. *Order dated December 9, 2014* (Doc. No. 90).

[2] Excluded from the Net Winner Class in this action were persons or entities that have entered into a settlement agreement approved by this Court or who resided outside the United States at the time of their participation in ZeekRewards.

3

**EXHIBIT C**

individually or together with another family member or through their shell corporation). Compl. at ¶ 2.

In February 2015, this Court certified the Net Winner Class under both Rule 23(b)(1)(A) and (b)(1)(B), noting that "the efficiency of one action in which all parties can argue their case and assert their rights will benefit both the Receiver and small winners," consistent with the intent of the rules permitting class actions. *See* Doc. No. 101. The common class questions to be resolved with respect to the Net Winner Class include "whether ZeekRewards operated as a Ponzi and/or pyramid scheme" and "whether the payments from ZeekRewards to class members are fraudulent transfers that must be disgorged and repaid." *Id*. at 4-5. On September 14, 2015, the Court appointed Kevin Edmundson as class counsel and subsequently the Court authorized the Defendant Class to engage an expert witness, Berkeley Research Group ("BRG"), at the primary expense of the Receivership.

## B.  The Ponzi Scheme

Beginning at least as far back as 2000, Paul Burks operated a number of generally unsuccessful multi-level marketing businesses through Rex Venture Group, LLC (and related entities).  In 2010, RVG launched Zeekler.com, a so-called "penny auction" website where items ranging from personal electronics to cash were auctioned to bidders.  A "penny auction" does not work like a typical auction. In a normal auction, it costs nothing to bid, and the auction price rises based on the amount of the bid until there is no higher bid or the amount of time set for the auction expires. In a "penny auction," bids must be purchased by bidders (e.g., for $1 per bid), and each incremental bid placed raises the amount of the total price of the auction item only by $0.01. Penny auctions have a timer, but unlike a typical auction, each new bid at the end of the timer resets the bid clock, usually for 30 seconds to a minute. The penny auction ends when the

4

**EXHIBIT C**

bid clock expires with no new bid. The winner then pays the auction price (plus the cost of bids used), which is typically well below the retail price. However, the unsuccessful bidders lose all the money they spent to purchase bids.

During 2010, the Zeekler penny auctions were not very successful. RVG's fortunes changed in 2011 when RVG launched a new money-making scheme – ZeekRewards. RVG promoted ZeekRewards as Zeekler.com's "private, invitation-only affiliate advertising division." Bell Aff. at Ex. 4.  In reality, ZeekRewards was just a multi-level marketing scheme grafted onto the Zeekler business. It purported to pay a portion of the alleged "profits" from the Zeekler penny auction business to participants who earned bid balances or points, primarily by buying auction bids. RVG told potential participants that "Zeekler tallies total sales and pays a percentage to all active ZeekRewards members." *Id*. at Ex. 5. Also, participants in ZeekRewards, called "Affiliates," were paid for recruiting other participants in a pyramid "multi-level" sales format.

Bidders on the Zeekler penny auctions could purchase bids at retail for $0.65, or they could acquire bids as ZeekRewards affiliates (or as free samples from RVG or an affiliate). ZeekRewards affiliates paid $1 for what RVG variously referred to as "compounding," "sample" or "VIP" bids. The retail bids and the compounding / sample / VIP bids all had the same effect in the auctions – placing a bid raised the price of an auction item by one cent. However, bids bought through ZeekRewards rather than as retail bids were more valuable because purchasing those bids gave the affiliates "points" that supposedly entitled Affiliates to a portion of the profits from the business. This was the real (and only) reason Affiliates would pay $1 for auction bids they could buy for $.65. *See* Brockett Dep. at 77-78.

5

**EXHIBIT C**

Further, ZeekRewards made clear that even though bids bought through ZeekRewards could be used in the auctions, that fact was irrelevant to the multi-level marketing scheme. Affiliates were told that using the bids in the auction would have no effect on their all-important bid or points balance ("Each time you buy a Compounding Bid in your ZeekRewards Back Office a bid is added to the Compounding bucket. *Spending the bid in an auction does not remove it from the bucket.*") (emphasis added). Bell Aff. at Ex. 7. Not surprisingly, even though a largely bogus "bid giveaway requirement" was added later in the scheme, relatively few ZeekRewards participants or "bid giveaway" recipients used their sample/VIP bids in the Zeekler auctions. Prior to shutdown, RVG estimated that only approximately 19 million VIP bids were used in auctions out of over 7 billion VIP bids created – less than 1/3 of 1%. *See*, *e.g.*, *Id*. at Ex. 8.

From the beginning, RVG intended to use "bids" in ZeekRewards not as a product but as a proxy for money deposited into the program. Quickly, RVG's focus changed from Zeekler to ZeekRewards, which was the source of nearly all the company's income. Relative to ZeekRewards, little or no money was made in the Zeekler "penny auction" business.

The sale of compounding / sample / VIP bids in ZeekRewards dwarfed the sale of "retail" bids. According to the ZeekRewards database, ZeekRewards sold approximately $820 million in compounding / sample / VIP bids, but only about $10 million in retail bids were sold. *See* Turner Report at 8. While over $400 million dollars was paid out to ZeekRewards Affiliates over the course of the scheme, the money used to fund ZeekRewards' distributions to Affiliates came almost entirely from new participants rather than income from the Zeekler penny auctions. *Id*. at Exhibit E. Only about $10 million dollars in retail bids were sold (of which $2.3 million reflected

**EXHIBIT C**

purchases by net losing Affiliates). So, the "profit" from the penny auction business, if there was any at all, could not have supported even 3% of the total payments made to participants.

Burks and the other Insiders were aware that the payouts to Affiliates would be funded by new participants rather than retail profits from the penny auctions. Dawn Wright-Olivares excitedly told Burks early in the scheme, "I think we can blow this OUT together- we've already attracted a great many big fishes." Bell Aff. at Ex. 4.

ZeekRewards succeeded because it promoted a lucrative "compensation plan," offering large amounts of passive income to entice individuals to participate in the scheme. The participants in the ZeekRewards scheme invested money in the scheme by buying so-called "bids/points," "memberships," "subscriptions," customer names, and other items related to the scheme. The compensation plan consisted primarily of two components: (1) the "Compounder," also known as the "Retail Profit Pool" or "RPP," which supposedly allowed participants to collectively share up to 50% of Zeek's net retail profits and receive a 125% return on investment; and (2) the "Matrix," which was a multi-level marketing commission program.

Initially, ZeekRewards promised a 125% return on a passive investment, describing the program as follows: "What if you found a very simple and quick way to earn 125% profit on the dollars you spend with us without ever having to sell a thing or recruit a soul?" *Id.* at Ex. 10. Another pitch touted the income participants would receive: "I found something I believe is absolutely out of this world . . . it's called the 'Compounder' and "grows income for you by compounding it daily;" . . . "the new system [lets] you earn every 24 hours and can generate for you 4 or 5 figures or more per month . . . ." "[I]f you've ever wanted to earn 5 figures or more monthly, passively, then this is your chance." *Id.* at Ex. 11. Similarly, de Brantes boasted that by

**EXHIBIT C**

participating in ZeekRewards: "Many are currently receiving $2,000 to $3,000 per month PASSIVELY." (emphasis in original). *Id.* at Ex. 12.

Early ZeekRewards participants were told to expect profit shares of .5% to 4% daily. *Id.* at Ex. 10. The first day the Compounder share percentage was allocated to participants was January 20, 2011, and the share percentage was 3.24%. *Id.* at Ex. 13. As the scheme progressed, participants continued to be told to expect large, consistent daily returns. On May 14, 2011, Paul Burks told Michael VanLeeuwen ("Coach Van") that "our goal has always been 1% Mon-Thurs and 1/2% weekends, Fri- Sun. We have always maintained those averages and exceeded them often." *Id.* at Ex. 14.

And, even after counsel advised against publicly promoting a 125% return, RVG continued to tell Affiliates and prospects to expect large returns. For example, de Brantes told an affiliate in July 2011:

> [O]ur average has been between 1.6–1.8% which would actually be a great deal more than 125%. The attorneys our [sic] advising us on what we can and can't say and now it's our job to figure out how much we need to pay daily to get everyone exactly what we intend to give (it makes it a little tricky but it is our intention to maintain a system that pays 125% without saying it anywhere on the site). …Right now we're still working on the 125% cap system. We just aren't saying 125%.

*Id.* at Ex. 15.

Therefore, Affiliates paid and invested money into ZeekRewards with the expectation that they would profit from their payments based on the success of the company's operations. All the income received by ZeekRewards and Zeekler, regardless of source, was pooled and comingled in a cast of financial institutions that changed as the scheme evolved or as financial companies refused to work with RVG.

8

**EXHIBIT C**

Although the specifics and the terminology of the ZeekRewards "Compensation Plan" changed from time to time as Burks and the other Insiders tried to prolong and prop up the scheme, the two pillars of the plan for most Affiliates were always: (1) "profit" sharing (first called the Compounder then later the Retail Profit Pool (or "RPP")) and (2) the multi-level marketing pyramid that paid Affiliates a "commission" on the membership fees paid by recruited "downline" Affiliates (known as the Matrix).

ZeekRewards' Affiliates' primary money making tool was the "Compounder." To participate in the Compounder, Affiliates purchased "compounding" bids, which earned Affiliates one point for each "compounding" bid that they purchased from the company. To become an Affiliate "qualified" to receive points required little or no effort, despite the bogus claim that Affiliates "earned" points. As discussed in more detail below, Affiliates were required to place daily one free digital ad (generally prepared by the company) for Zeekler.com. Later, Affiliates were told they needed to "give away" the bids in order to obtain points, although in practice this so-called "requirement" was easily met: Affiliates could simply pay extra to have the company "give away" the bids for them. *Id*. at Ex.16. In effect this was, in turn, just yet another revenue source for the company.

As the inducement to purchase these "compounding" bids, ZeekRewards told Affiliates that the company would give a portion of the company's daily earnings or profits (often claimed to be 50%) to point-holding Affiliates. The size of the daily "profit sharing" payment each affiliate received through the Compounder was based upon the number of points the affiliate held in his or her account. The size of each Affiliate's daily award depended only on the Affiliate's point total. Thus, regardless of the Affiliates' efforts, buying more points resulted in a larger profit share, just like having more shares of stock results in a larger dividend for a stockholder.

9

**EXHIBIT C**

ZeekRewards described the "Compounder" process as follows: "At the end of each business day (7 days a week) the company determines its daily overall profitability and rebates a percentage back to its Active Advertising Affiliates based on each individual Premium Members Compounder Bid Balance." *Id*. at Ex. 4. Each day, affiliates had a choice to be paid all or a portion of the so-called "profit" award in cash or to use the "cash" award to buy more bids/points, which then added to the bid / points balance and "compounded" as the daily percentage awards were made. Burks and the other insiders understood that the compensation plan would be unsustainable in both the short run and the long run because there would not be enough new participants to support full daily cash payments to a growing number of existing Affiliates. *See*, *e.g.*, Turner Report at Exhibit G, p.15.

Prior to the shutdown of ZeekRewards, there were over 3 billion VIP bid points in the ZeekRewards system. *See Id.*  Based on the actual average daily "profit" percentage of 1.43% used during the scheme, the daily "profit" award to Affiliates would be over $40,000,000 on 3 billion points. The amount of money paid in to ZeekRewards daily was far less than $40 million. Therefore, if RVG had been required to pay the daily awards supposedly available to Affiliates in cash, ZeekRewards would have quickly collapsed. Specifically, during the last month ZeekRewards operated (July 16, 2012 to August 15, 2012) the daily average RPP award purportedly available to participants was $38,237,036, but the daily receipts (from all sources, not just retail auctions) were much smaller, averaging approximately $9,722,000. *See Id.*  Thus, not only were the ZeekRewards payouts made from the money put in by other participants, but the so-called "profit" awards greatly exceeded total receipts, which, of course, was unsustainable.

10

**EXHIBIT C**

To maintain the program for as long as possible and generate the most income, ZeekRewards actively discouraged Affiliates from requesting actual payment of all their profit awards in cash. Instead, Affiliates were encouraged to let their balances "compound" and only take 20% or less of their "earnings." Bell Aff. at Ex. 17.

ZeekRewards eventually changed the name of the Compounder to the "Retail Profit Pool," or "RPP." In addition, they changed the name of compounding bids to "VIP bids" or "sample bids." However, while the names changed, the essential nature of the "profit" sharing scheme remained the same. In one email, when referring to compounding bids being renamed VIP bids, Wright-Olivares wrote, "wherever you see a (compounding) next to VIP – you will know that these terms are interchangeable," and she later wrote that "no change has been made in how they operate, qualify or earn." *Id*. at Ex. 18. Indeed, Wright-Olivares admitted that she thought the name changes were a joke. In a June 15, 2011 email to O.H. Brown, an RVG advisor whose company created marketing videos for ZeekRewards, about a company webinar script, she said: "you'll see where I started to say Retail Profit Pool (lol) instead of Compounder…. We're going to call compounding bids – VIP bids." *Id*. at Ex. 19.

Whether called the Compounder or the Retail Profit Pool, the program was a fraud because the payments had no relation to actual "retail" profits nor were they calculated from real receipts or expenses.  Instead, the alleged "profit percentage" was nothing more than an arbitrary number made up by Burks or one of the other Insiders. Most days, Burks made up the number. As Danny Olivares explained to RVG's internet provider, "Paul [Burks] goes in nightly and opens up adm_displayCompunder3.asp and enters a decimal percentage." Id. at Ex. 20. Sometimes, the number was made up by Dawn Wright-Olivares or Danny Olivares.

11

**EXHIBIT C**

Rather than reflecting the typical variances that might be expected in a company's profits, the alleged profits paid in ZeekRewards were remarkably consistent, falling nearly always between 1% and 2% on Monday through Thursday and between .5% and 1% on the weekends, Friday through Sunday. The goal of this fake consistency was to project the appearance of a stable source of income to entice new participants and to encourage existing Affiliates to allow their bid balances to compound rather than request payment of their daily award in cash. And, with RVG's knowledge, Affiliates regularly touted the consistent payments in their recruiting of new participants. For example, "Coach Van's" email footer stated: "It has been going like clockwork for over 220 days, 7 days per week."…. "EVERYONE. . .GETS. . .PAID. . .FIRST. . .DAY!" . . . This works every time with just one minute per day! If you're not getting paid every single day for 1 minute of work, . . . [sic] why not?" . . . "100 percent of our active members are paid daily 100 percent of the time within their first 24 hours without any referrals." *Id*. at Ex. 21.

The payouts were so consistent that when a mistake was made (such as when an extra decimal place was added to the "profit" percentage or the lower "weekend" percentage was used on a "weekday") Affiliates would immediately complain. For example, on August 3, 2012, de Brantes sent Danny Olivares a Skype message saying, the "Thursday [RPP] commission's % are running like a weekend commission % and everyone is going crazy." *Id*. at Ex. 9(c). Olivares replies that, he is "working on it." *Id*.

And, the Insiders realized that not paying Affiliates, even once, was not an option if they wanted to keep the scheme going. On May 20, 2012, there were problems with payments to affiliates. Dawn Wright-Olivares texted Danny Olivares and instructed him to post an update letting affiliates know their payments would eventually be processed and commissions would be

**EXHIBIT C**

paid, telling him, "[t]he fastest way to get charge [sic] as a Ponzi scheme is for distributors to claim they are not getting paid." *Id.* at Ex. 22.

Burks deliberately evaded affiliate questions asking how the RPP was calculated. In a Skype chat with an affiliate, he said: "[a] proprietary system is used to determine the amount of profit sharing that is done each day. We do not divulge the details of how those numbers are determined. Our stated target of minimum of 1% weekdays (Mon- Thur) and .5% weekends (Fri- Sun) has always been met and exceeded. It is clearly not directly tied to the number of auctions in a particular day. It is the overall average that counts." *Id.* at Ex. 9(d). Behind the scenes, the Insiders were not even subtle about the fake earnings numbers. Often, the company simply used the previous week's daily RPP percentages. For example, on one occasion, Danny Olivares sent a text message to multiple insiders stating, "Need a % for rpp when you can." Dawn Wright-Olivares responded, "Do whatever was last Monday." *Id.* at Ex. 40. Or, from Paul Burks: "Hey Dan. Sorry about last night. What percent did you use?" Danny Olivares: "Same as last Friday. 0.009." *Id.* at Ex. 23.

Sometimes, Burks even told Danny Olivares in advance what a day's profit number would be, such as on September 14, 2011, when in the early morning Burks told him "to start the RPP run shortly after 7p.m. using .00179 as the percentage" because Burks was not going to be able to run it himself. *Id.* at Ex. 24. Even if the Insiders had intended to calculate actual profits (which they plainly did not), RVG did not maintain financial records sufficient to allow Burks or anyone else to calculate a daily retail profit for the company. *See* Turner Report at 7 ("[T] there is no indication that the records existed that could calculate Zeek's daily profit.").

In an unsuccessful effort to avoid the obvious legal infirmity of Affiliates simply buying points in return for the expectation of a share of the profits (like a stock purchase), ZeekRewards

13

**EXHIBIT C**

told Affiliates that in order to supposedly "earn" their points, they were required to place a short, free digital ad each day on one of the many free classified websites available on the internet. Affiliates were told to merely copy and paste free ads created by ZeekRewards into a free digital classified ad website. Bell Aff. at Ex. 25.

Affiliates then submitted the ad's internet link to ZeekRewards to verify that they had placed the ad. Placing more ads or better ads did not change an Affiliate's share of the profits in any way. And, the ad "requirement" was not imposed on all Affiliates. Burks even wrote a computer program that allowed a number of Affiliates who managed multiple accounts to avoid placing the ads altogether. As Burks wrote in an email to Danny Olivares on January 23, 2011, "This allows us to defer to some of our major people like Agnita Solomon who manage dozens of accounts so that they don'e [sic] have to place so many ads every day." *Id*. at Ex. 26.

The "ad" process was intended to be very simple and was widely advertised as taking only 3-5 minutes each day. For example, Burks routinely told Affiliates: "Placing an ad takes three to five minutes a day and can be done from anywhere there is an Internet connection." *Id*. at Ex. 27. The company did not believe that these digital ads made any material difference in the success of the Zeekler auctions and did no research to determine if the ads were successful. In reality, the ads were just an attempt to manufacture a cover for what was nothing more than the investment of money by Affiliates with the expectation of receiving daily "profit" distributions.

In a further effort to justify the Affiliates' investments of money, beginning in August 2011, ZeekRewards purportedly required Affiliates to "give away" their purchased VIP bids to earn points. *Id*. at Ex. 28, 29. The claimed intent of this "requirement" was to promote use of the auctions by new retail customers who received these free bids. However, Burks and the insiders

knew that in practice the bid "give away" program (like the free ads) had no material impact on the success of the penny auctions.

First, the company made little or no attempt to determine if bids had in fact been given to legitimate prospective retail customers. Many Affiliates simply listed fake email addresses, addresses of other existing Affiliates or those planning to be affiliates, family members, and other non-productive locations for where the bids had been given away. *Id*. at Ex. 30. In some cases, the company just agreed not to require the affiliate to give away their bids to earn points.

Also, both as a way to minimize any real effort by Affiliates and a way to make more money, Affiliates were given the opportunity to pay to have the company (supposedly) give the bids away on behalf of the affiliate. *Id*. at Ex. 31. Points were earned when the bids were given to the company (supposedly) to be given away. In fact, the company did not find prospective retail customers to whom it could give away all the bids, so millions of bids remained in the company unused. But, ZeekRewards did make an additional $2.00 - $2.50 per customer "sold" to Affiliates. And, because there were alleged limits on the number of bids that could be given away to any one person based on the Affiliate's membership level, tying the "give away" of bids to the accrual of points drove "upgrades" in membership levels which increased revenues even more. *Id*.

Danny Olivares explained the process of how VIP bids were automatically given away to accrue points for Affiliates as follows: After a VIP bid is purchased, the "Company pool automates the process of giving bids away as samples. Giving the bids away as samples is what generates VIP points. Which the rpp uses to calculate your award. So we come full circle." *Id*. at Ex. 32.

15

**EXHIBIT C**

Burks told Affiliates that the company-wide Bid Pool would "take ALL of the sting out of the whole bid-give requirement! . . . [Y]ou will be able to automatically give your bids each day" and "you will automatically receive the VIP points as soon as you receive your daily RPP award each day. . . . All you'll have to do is select the "Give my bids to the Zeek bid pool" option and the system will automatically give your bids to your customers and every customer that registers @ Zeekler.com that wants free bids! If you do not have any customers then you simply purchase them as you need them from the customer co-op, and that will be automated as well!" *Id*. at Ex. 29.

Later, Affiliates were not allowed to simply pay the company to "give away" the bids for them, but they were allowed to pay third parties to do so. *Id.* at Ex. 33. Again, RVG made no effort to determine if these bids were in fact given to legitimate potential retail customers.

The second broad component of the ZeekRewards compensation plan was paying Affiliates to recruit other Affiliates in a pyramid-style payment system. ZeekRewards referred to this system as the "Matrix." The Matrix pyramid was initially a "2x21" matrix in which Affiliates made multi-level marketing commissions for 21 levels down in their "organization." *Id*. at Ex. 34, 35. Later, ZeekRewards used a "2x5 forced-fill matrix," which is a pyramid with 63 positions within the five levels (the number of persons doubles at each successive level). The scheme paid a bonus to Affiliates for every "downline" investor within each affiliate's personal matrix, plus a "matching bonus" for every 5th level where certain qualifiers were met. Therefore, commissions could be earned indefinitely as the pyramid expanded.

To get bonuses through the Matrix, Affiliates just had to (1) enroll in a monthly subscription plan requiring payments of $10, $50, or $99 per month; and (2) recruit at least two other "Preferred Customers" (i.e., investors who also enrolled in a monthly subscription plan).

16

**EXHIBIT C**

*Id*. at Ex. 18. Once qualified, affiliates earned bonuses and commissions for every paid subscription within their "downline" pyramid, whether or not they personally recruited everyone within the matrix. Simply put, Affiliates were rewarded merely for recruiting new investors without regard to any efforts by the Affiliates to sell bids or products or otherwise materially support the Zeekler retail business.

The funds raised through the Matrix were commingled with the money raised through the Compounder / Retail Profit Pool (and what little money came in from the retail auction business), so nearly all the money used to pay the pyramid commissions came from other investors in the scheme. While some commissions were available to Affiliates on customers' purchases of retail bids for use in the Zeekler auctions, Affiliates did not need to sell retail bids to customers in order to receive commissions through the Matrix. Furthermore, overall commissions from the sale of retail bids to end-user customers were miniscule (retail bids accounted for only 1.1% of the money paid into the scheme). *See* Turner Report at 8. These retail commissions, referred to by RVG as "Zap Commissions," were merely incidental to the overall commissions earned through the Matrix for downline subscription payments and through the Compounder/RPP.

As with the Compounder, the Insiders changed the terminology for the Matrix, but they never changed the real essence of the scheme. Dawn Wright-Olivares explained the cosmetic changes to the Matrix this way: "you [will] in effect be paid on levels 5-10".... "but we can't SAY that. Deep matrices get shut down. So instead...we say that you are getting a matching bonus on all of the 2x5's on your 5th level. It's semantics, but semantics mean a great deal with regulators." She went on, "[I] don't really understand how they can say they have levels 10, 15, etc. when it's a 2x5, but if we can get away with it this way - then it's my vote to leave it alone."

**EXHIBIT C**

Bell Aff. at Ex. 9(e). Similarly, Keith Laggos, a ZeekRewards advisor, emailed Dawn Wright-Olivares (copying Burks) in July 2011: "when talking about matching bonuses, you are showing being paid on 1 to 10, 1 to 15 and 1 to 20 levels. This defeats what we did by going to a 2x5 matrix. You should say a 100% matching on all your 5th, 15th and 20th level affiliates' 2 x 5 matrixes. I know you want to show they get paid on 20 levels in a 2 by 20 matrix, but that is when you can get a pyramid investigation or charge." *Id*. at Ex. 36.

RVG's insiders often worried about being caught and sought to make the unlawful scheme seem legitimate in many ways. As described above, the changing of terminology or the rules of the game, but not the substance of the scheme, was a common practice.

Throughout 2011 and 2012, Burks and the Insiders regularly changed the names of the program elements or demanded that Affiliates stop using certain words, which accurately described the scheme but highlighted its illegality. For example, on July 26, 2011, de Brantes emailed an Affiliate with a list of things the Affiliate can and cannot say, including: "compounder, compound, compounded, compounding, 125%, Members, Interest, Investment, Mature."  On the list of sanitized things the Affiliate could say: "You make a purchase and re-purchase; You earn bids; The bids retire on a 90 day timeline averaging 1.5% a day; You get cash rewards; Retail Profit Pool; Everyone is an Affiliate and they own business center subscriptions; Your Bid balance can increase as oppose to mature." *Id*. at Ex. 37.

Also, RVG employees openly discussed the words that could and could not be used when promoting the scheme, even adding a bit of black humor as the scheme headed towards its inevitable demise. On June 8, 2012, de Brantes and others discussed "training" Affiliates on "the top 10 or 12 words that every Affiliate should erase from their vocabulary". The list included "investment, put money in, roi [return on investment], fund, passive income, passive returns,

18

**EXHIBIT C**

returns and points are not dollars." In response to this list, Ken Kilby (a supposed "compliance

officer") suggested adding: "BBB, Attorney General, FBI, FTC, Report, turn you in." *Id*. at Ex.

38.

Beyond the shifting terminology, Burks and the Insiders tried to bolster the perception of

the legitimacy of the scheme by running "Compliance" courses for Affiliates. *Id*. at Ex. 39. As

with the advertising or bid give-away "requirements," the "compliance" courses were just an

effort to obscure the fraud and wrap it in a cloak of propriety, while making even more money in

the process.

After an extensive investigation, the Receiver filed this action. The Complaint asserts

claims for violation of the NCUFTA, Common Law Fraudulent Transfer and Constructive Trust.

The Receiver seeks Judgment against each of the Named Defendants in the amount of their net

winnings from the ZeekRewards scheme. With respect to the Net Winner Class, the Receiver

seeks a Declaratory Judgment determining that the net winnings they received were fraudulent

transfers from RVG that must be repaid to the Receiver and are subject to a constructive trust for

the benefit of the Receivership Estate. Ultimately, the Receiver seeks a final Judgment against

each Net Winner Class member in the amount determined to be their net winnings through a

process to be set by the Court that provides class members the opportunity to respond to the

Receiver's calculation of their net winnings.

## II.    DISCUSSION

Summary judgment should be granted where there is no genuine issue as to any material

fact and the "movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party

opposing summary judgment cannot rely on conclusory allegations, unsubstantiated assumptions

or a scintilla of evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585-

**EXHIBIT C**

86 (1986).  Rather, the non-moving party must "set out specific facts showing a genuine issue for

trial." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576

(4th Cir. 2010).

Despite engaging a defense expert to investigate the fundamental issue of whether or not

ZeekRewards operated as a Ponzi scheme, Defendants have conceded that ZeekRewards was, in

fact, a Ponzi scheme.  Nevertheless, Defendants argue that the Court should not grant summary

judgment in favor of the Receiver.  The Court will address each of Defendants' arguments

below.

Defendants first contend that a one-year limitations provision in ZeekRewards' website's

"Terms of Service" ("TOS") bars the Receiver's claims. The TOS provided:

> The TOS along with the Privacy Policy and Purchase/Membership/Affiliate
> agreement constitute the entire agreement between you and ZeekRewards and
> govern your use of the Service . . . You agree that regardless of any statute or law
> to the contrary, any claim or cause of action arising out of or related to use of the
> Service or the TOS must be filed within one (1) year after such claim or cause of
> action arose or be forever barred.

Doc. No. 135-2, p. 30.

Defendants' position is that because the Receiver stands in the shoes of RVG, he is bound by the

TOS and its limitations provision.  Essentially, Defendants are arguing that a subsequently

appointed receiver's fraudulent transfer claims can be barred by the terms under which the

scheme was implemented.

Contrary to Defendants' argument, a receiver is not bound by an agreement that the

fraudster, "acting with the intent to defraud, signed on behalf of" the company in receivership.

*See Hodgson v. Kottke Assocs., LLC*, Civ. Action No. 06-5040, 2007 WL 2234525, at *7 (E.D.

Pa. Aug. 1, 2007).  As is readily apparent, it "would create a perverse incentive . . . for a court to

rule that a party who fraudulently enters into an agreement subsequently bars a trustee or

20

**EXHIBIT C**

receiver from bringing an action to recover the funds fraudulently transferred pursuant to that

agreement." *Id.* If the terms implementing a fraudulent scheme could shorten the limitations

period to eliminate or cut off a receiver's claims at an earlier date, a fraudster would have a

strong incentive to include a limitations period much shorter than the statutory period (here one

year instead of four) as a means to protect investors in his scheme from clawback actions down

the road. Indeed, adopting Defendants' position would create a ready-made roadmap for

fraudsters to protect anyone who won money in their scheme, thus further encouraging

participation and enhancing the scheme. Such a result would undermine a receiver's ability to

perform his duties and severely weaken his ability to serve his role as "an instrument of court . . .

acting also for the stockholders of the corporation, and the creditors of the corporation." *Drennen

v. S. States Fire Ins. Co.*, 252 F. 776, 787 (5th Cir. 1918). Accordingly, the Court finds that

applicable statutory limitations periods apply in this case and the Receiver's claims are timely

filed.

### A. Fraudulent Transfer Claims

The NCUFTA permits a receiver to avoid a transfer made "with the intent to hinder,

delay, or defraud any creditor of the debtor" within four years after the transfer was made. *See*

N.C. Gen. Stat. §§ 39- 23.4(a)(1) (fraudulent transfers); 39-23.1 (definitions); 39-23.9 (statute of

limitations). Many courts have held that the intent to defraud can be presumed when transfers are

in furtherance of a Ponzi scheme. The "Ponzi scheme presumption" has been long settled in a

number of jurisdictions and under an analogous section of the Bankruptcy Code.

Bankruptcy Code Section 548(a)(1)(A) provides that a trustee may avoid a transfer of an

interest of the debtor in property, if the debtor made such transfer with actual intent to hinder,

delay, or defraud creditors. 11 U.S.C. § 548(a)(1)(A). A majority of federal courts have held that

proof of operation of a Ponzi scheme is sufficient to establish actual intent to hinder, delay, or

defraud creditors to permit avoidance of a fraudulent transfer under section 548(a)(1)(A). *See*,

*e.g.*, *Gold v. First Tenn. Bank, N.A. (In re: Taneja)*, No. 10-1225, 2012 Bankr. LEXIS 3554,

\*13-14 (E.D. Va. Jul. 30, 2012).   Transfers in furtherance of a Ponzi scheme "have achieved a

special status in fraudulent transfer law" from which intent of actual fraud may be inferred. *In re*

*Cohen*, 199 B.R. 709, 717 (9th Cir. BAP 1996).

  Courts in the Receivership context outside bankruptcy also routinely apply the Ponzi

scheme presumption to avoid fraudulent transfers. *Janvey v. Brown*, 767 F.3d 430 (5th Cir.

2014); *Wing v. Dockstader*, 482 Fed. App'x. 361, 363 (10th Cir. 2012);  *see also*, *Warfield v.*

*Carnie*, No. 3:04-cv-0633, 2007 WL 1112591, at \*9 (N.D. Tex. Apr. 13, 2007).

  The U.S. Bankruptcy Court for the Middle District of North Carolina held that the "Ponzi

scheme presumption" of actual fraudulent intent also arises in fraudulent transfer actions brought

under N.C. Gen. Stat. § 39-23.4(a)(1). *Ivey v. Swofford (In re Whitley)*, 463 B.R. 775, 781

(Bankr. M.D.N.C. 2012). In reaching its conclusion, the court looked to the interpretation of the

Uniform Fraudulent Transfer Act in other jurisdictions, as well as the relevant sections of the

Bankruptcy Code. *See Id.* at 782 (citing *In re AFI Holding, Inc.*, 525 F.3d 700, 704 (9th Cir.

2008); *In re Mortg. Store, Inc*., Slip Copy, 2011 WL 3878355, at \*2 (Bankr. D. Hawaii Sept. 1,

2011); *In re Dreier LLP*, 452 B.R. 391, 435 (Bankr. S.D.N.Y. 2011); *PHP Liquidating, LLC v.*

*Robbins (In re PHP Healthcare Corp.)*, 128 Fed.App'x. 839, 847 (3d Cir. 2005); *ASARCO LLC*

*v. Ams. Mining Corp.*, 396 B.R. 278, 365 (S.D. Tex. 2008)).

  There is no genuine issue of material fact that ZeekRewards operated as a Ponzi scheme.

Accordingly, the law considers transfers from the scheme to be fraudulent transfers that may be

avoided under the NCUFTA.

**EXHIBIT C**

Defendants argue that regardless of whether RVG had bad intentions, summary judgment should be denied as to this claim because there is a genuine issue of material act as to whether the Defendants acted in good faith and provided "reasonably equivalent value" in return for their net winnings. [3]  Defendants argue that in exchange for the income they received from ZeekRewards, the evidence shows that they directed new customers to the Zeekler.com penny auction site, promoted the auction by placing daily advertisements on the internet, networked with other marketing professionals to gain greater exposure for Zeekler and ZeekRewards, set up websites to drive traffic to Zeekler and ZeekRewards, recruited new customers, and participated in training programs, leadership calls, and mandatory compliance programs.  They liken themselves to "internet marketing specialists" and contend that they provided more than reasonably equivalent value for the payments they received.

Actual participants and investors in a Ponzi scheme cannot establish that they gave "reasonably equivalent value" for their winnings through their efforts participating in and recruiting others to the scheme.  Nearly all the courts that have considered this issue have determined that participants and investors may be entitled to a return of their principal investment, but must return the amount received beyond that investment.  *See*, *e.g.*, *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) ("In the case of Ponzi schemes, the general rule is that a defrauded investor gives 'value' to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal."); *see also Wing*, 482 F. App'x at 365-66; *In re AFI Holding, Inc.*, 525 F.3d at 704; *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006); *Scholes v. Lehmann*, 56 F.3d 750, 757–58 (7th Cir. 1995).[4]  The Ninth

---

[3] N.C. Gen. Stat. § 39-23.8(a) provides an affirmative defense under the NCUFTA to a transferee who acted in good faith *and* provided reasonably equivalent value in exchange for the transfer.

[4] Despite Defendants' suggestion, there is no recent "trend" away from this rule.

23

**EXHIBIT C**

Circuit has explained one rationale for this rule: "The policy justification is ratable distribution of remaining assets among all the defrauded investors. The 'winners' in the Ponzi scheme, even if innocent of any fraud themselves, should not be permitted to 'enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky.'" *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) (quoting *In re United Energy Corp.*, 944 F.2d 589, 596 (9th Cir. 1991)).

Moreover, courts have routinely and specifically held that there is no value in recruiting new investors to a fraudulent scheme. *See, e.g.*, *Wing v. Dockstader*, No. 2:08 CV 776, 2010 WL 5020959, at *6 (D. Utah Dec. 3, 2010) ("[T]he court disagrees with the notion that a person paid to refer investors to a ponzi scheme is more akin to the venture's utility provider than the investors."); *In re Nat'l Liquidators, Inc.*, 232 B.R. 915, 919 (Bankr. S.D. Ohio 1998) ("The Trustee has established that the Debtor received less than a reasonably equivalent value, because all that the Debtor received in return for the transfers was the use of the Defendants' money to run the 'ponzi' scheme."); *In re Randy*, 189 B.R. 425, 438 (Bankr. N.D. Ill. 1995) (holding that "as a matter of law, when brokers are paid commissions for their efforts in promoting a Ponzi scheme, these commissions are fraudulent transfers"). The Fifth Circuit has aptly summarized the lack of merit in Defendants' argument, stating "[i]t takes cheek to contend that in exchange for the payments he received, the RDI Ponzi scheme benefited from his efforts to extend the fraud by securing new investments." *Warfield*, 436 F.3d at 560.

Moreover, the cases Defendants cite in support of their argument involve innocent trade creditors or third-parties providing "legitimate" services in the ordinary course of business. Defendants are actual participants/investors in the Ponzi scheme, not third-party service providers.

The Court finds that here is no genuine issue of material fact that Defendants did not provide "reasonably equivalent value" for their winnings.[5]  Accordingly, the Court grants summary judgment in favor of the Receiver on the NCUFTA claim.[6]

## B. Constructive Trust Claim

The Receiver's final claim against the Defendants seeks the imposition of a constructive trust with respect to any transfer of funds, assets, or property from the Receivership Entities, as well as any assets later obtained by Defendants using the transferred funds.

> A constructive trust is a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust.

*Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744, 751–52 (N.C. 2012) (quoting *Wilson v. Crab Orchard Dev. Co.*, 171 S.E.2d 873, 882 (N.C. 1970)).

The Defendants argue that a constructive trust is only available when a fiduciary relationship exists and there is no adequate remedy at law.  They also contend that a constructive trust requires a traceable or identifiable *res*, and the Receiver bears the burden of proving traceability.

Citing *Variety Wholesalers,* the Receiver correctly points out that a fiduciary relationship is not required for imposition of a constructive trust.  All that is required under that decision for a

---

[5] Thus there is no reason for the Court to discuss the "good faith" argument of the Defendants, as the affirmative defense requires both good faith and reasonably equivalent value.

[6] In addition to seeking avoidance of fraudulent transfers pursuant to the "actual fraud" provision of the NCUFTA (N.C. Gen. Stat. § 39-23.4(a)(1)), the Receiver's First Claim for Relief also seeks avoidance pursuant to the "constructive fraud" provision of the statute (N.C. Gen. Stat. § 39-23.4 (a)(2)).  The Court finds it unnecessary to discuss this claim given the Court's holding that the transfers herein may be avoided pursuant to § 39-23.4(a)(1). Likewise, the Court finds it unnecessary to analyze the Receiver's alternative claim for common law fraudulent transfer.

**EXHIBIT C**

constructive trust is an "inequit[y]" or "unconscientious matter." *Id.* at 752.  Here, the Ponzi scheme easily qualifies as inequitable and unconscientious.

Moreover, as this Court has previously noted, Defendants were early adopters of the ZeekRewards scheme and as result, these named Defendants may have already dissipated much of their net winnings. Without a constructive trust it would be impossible for the Receiver to trace and secure these fraudulently transferred Receivership Assets. Thus, the Receiver's remedy at law would be inadequate.

Finally, allowing the lack of traceability to defeat the Receiver's constructive trust claim would create a perverse incentive for every net winner of any Ponzi scheme to spend any proceeds received from the scheme before a receiver could start to unwind it and then claim that the assets were gone.  "In cases involving Ponzi schemes, courts have taken a broad view of the constructive trust remedy, and the tracing requirement, in order to effectuate the goal of returning to the victims of the fraud their stolen property or proceeds of that property." *S.E.C. v. Credit Bancorp, Ltd.*, 138 F. Supp. 2d 512, 533 (S.D.N.Y. 2001), *rev'd in part, vacated in part on other grounds*, 297 F.3d 127 (2d Cir. 2002). In *United States v. Benitez*, 779 F.2d 135 (2d Cir. 1985), for example, the Second Circuit held that a constructive trust could be imposed on the assets of a Ponzi scheme, even though those funds were "not traceable." *Id.* at 140; *see also United States v. Schwimmer*, 968 F.2d 1570, 1584 (2d Cir.1992) ("To the extent this Court tolerated a very relaxed tracing standard in *Benitez*, it was with an eye to permitting the District Court to exercise this general, victim-compensation function, without being hampered by strict definitions of property rights.").

Indeed, "[e]quity applies the principles of constructive trusts wherever it is necessary for the obtaining of complete justice . . .." *Speight v. Branch Banking & Trust Co.*, 83 S.E. 734, 736

**EXHIBIT C**

(N.C. 1936).   Imposing a constructive trust under the circumstances herein furthers the

Receiver's ability to recover the assets of the ZeekRewards Ponzi scheme and distribute them to

the net losers, thus making the victims as whole as possible.   Accordingly, summary judgment in

favor of the Receiver is appropriate.

IT IS THEREFORE ORDERED that the Receiver's Motion for Summary Judgment

Against Remaining Named Defendants is hereby GRANTED; and

IT IS FURTHER ORDERED that the Receiver's Motion for Partial Summary Judgment

Against the Net Winner Class as to all liability issues is hereby GRANTED.


Signed:   November  29,


Graham C. Mullen
United States District Judge


27

**EXHIBIT C**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| **KENNETH D. BELL, in his capacity as court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com,** )<br>)<br>)<br>)<br>) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **TODD DISNER, in his individual capacity and in his capacity as trustee for Kestrel Spendthrift Trust; TRUDY GILMOND; TRUDY GILMOND, LLC; JERRY NAPIER; DARREN MILLER;  RHONDA GATES; DAVID SORRELLS; INNOVATION MARKETING, LLC; AARON ANDREWS; SHARA ANDREWS; GLOBAL INTERNET FORMULA, INC.; T. LEMONT SILVER; KAREN SILVER; MICHAEL VAN LEEUWEN; DURANT BROCKETT; DAVID KETTNER; MARY KETTNER; P.A.W.S. CAPITAL MANAGEMENT LLC; LORI JEAN WEBER; and a Defendant Class of Net Winners in ZEEKREWARDS.COM;** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **No. 3:14-cv-91** |
| ) | |
| **Defendants.** ) | |

## <u>FINAL JUDGMENT</u>

In accordance with the Court's Order Granting Entry of Final Judgment Against Certain

Net Winner Class Members, Final Judgment is hereby entered against each of the class members

listed on the following single page attachments in the amounts listed therein, which are comprised

of net winnings from the ZeekRewards scheme and prejudgment interest, calculated at the North

Carolina statutory rate of 8% per annum from August 17, 2012, which is on or after the date of the

last fraudulent transfer payment on which liability is based, to November 29, 2016, the date of the

Summary Judgment Order in this action.  See N.C. Gen. Stat. § 24-4, 5 (2001); Doc. #142.  An

## EXHIBIT D

index of the individual class members and the amount of the Judgments against them is also attached.

Post-judgment interest shall accrue on the entire Final Judgment, including the award of prejudgment interest, at the rate specified under 28 U.S.C. § 1961 from the date of entry of this Judgment until paid in full.

The Court confirms each amount listed in the attachments is the Final Judgment of the Court against each respective Defendant and hereby authorizes the Receiver to pursue appropriate collection proceedings.

SO ORDERED.

Signed: August 14, 2017

Graham C. Mullen
United States District Judge

**EXHIBIT D**

BELL v. DISNER, Case No. 3:14-cv-00091-GCM
INDEX OF FINAL JUDGMENTS

| No. | Name | City | State | ZeekRewards Username | Net Winnings | Pre-Judgment Interest | Total Amount of Final Judgment |
|---|---|---|---|---|---|---|---|
| 3418 | KUTUCHA CROUCH | RENO | NV | TCDREAMER | $18,573.94 | $6,369.95 | $24,943.89 |
| 3419 | KWAKU BOAKYE | BOLINGBROOK | IL | PROFBOAKYE | $7,551.80 | $2,589.90 | $10,141.70 |
| 3420 | KWONG HOOI CHAN | STATEN ISLAND | NY | KHC | $10,267.50 | $3,521.25 | $13,788.75 |
| 3421 | KWONH NO | FLUSHING | NY | SANTOKI | $2,374.33 | $814.28 | $3,188.61 |
| 3422 | KYLE CRAWFORD | ST. THOMAS | VI | ZEEKMAH | $3,761.01 | $1,289.84 | $5,050.85 |
| 3423 | KYLE EMERSON | TOANO | VA | ZEEKMAH | $12,738.43 | $4,368.66 | $17,107.09 |
| 3424 | KYLE MEEKER | GARNETT | KS | JAYMEEKER | $6,792.13 | $2,329.37 | $9,121.50 |
| 3425 | KYLE W. WOLACK | MISSION VIEJO | CA | WOLACK | $10,220.31 | $3,505.06 | $13,725.37 |
| 3426 | KYLE WAYNE GRANHOLM | HOLLY SPRINGS | NC | KWGRAND | $13,777.67 | $4,725.06 | $18,502.73 |
| 3427 | KYLEIGH FOSTER | MERIDIAN | ID | KYLEIGH | $51,967.96 | $17,822.45 | $69,790.41 |
| 3428 | KYU M CHO | GREENSBORO | NC | FOREVER1 | $10,050.41 | $3,446.80 | $13,497.21 |
| 3429 | KYU M CHO | GREENSBORO | NC | FOREVER11 | $1,867.75 | $640.55 | $2,508.30 |
| 3430 | KYUNGSUN CHUN | BAYSIDE | NY | KINDPEARL | $1,822.40 | $624.99 | $2,447.39 |
| 3431 | L A HODGES | EUSTIS | FL | WEBMENTOR | $6,894.38 | $2,364.43 | $9,258.81 |
| 3432 | L. P. WOOD | HEYBURN | ID | AMERICANDREAM | $13,527.67 | $4,639.33 | $18,167.00 |
| 3433 | LACEY DUNCAN | ARCADIA | FL | LRD25 | $7,076.86 | $2,427.01 | $9,503.87 |
| 3434 | LAHENS FREMOND | SALISBURY | MD | HUDGESUCCESS | $2,458.39 | $843.11 | $3,301.50 |
| 3435 | LAI FONG LAM | DULUTH | GA | LUCKYJ | $5,654.18 | $1,939.11 | $7,593.29 |
| 3436 | LAI HING CHOW | OAKLAND | CA | LHC128 | $1,555.62 | $533.50 | $2,089.12 |
| 3437 | LAI K HA | MARIETTA | GA | LAIHA | $58,365.59 | $20,016.53 | $78,382.12 |
| 3438 | LAI SHIU LUN | NEW YORK | NY | MELISSA123 | $9,748.55 | $3,343.27 | $13,091.82 |
| 3439 | LAKEISHA M FORD | KILLEEN | TX | LFORD | $23,612.21 | $8,097.83 | $31,710.04 |
| 3440 | LALAT MOHAN | BETHPAGE | NY | LUCKY20 | $4,638.25 | $1,590.69 | $6,228.94 |
| 3441 | LAM AH TAT | ALHAMBRA | CA | IJK228 | $4,134.61 | $1,417.97 | $5,552.58 |
| 3442 | LAMBERTO TORRES | SAN PEDRO | CA | BURT12345 | $75,116.43 | $25,761.24 | $100,877.67 |
| 3443 | LAMDANG NGUYEN | GARDEN GROVE | CA | LDN | $6,863.50 | $2,353.84 | $9,217.34 |
| 3444 | LAMPTY EMMANUEL | ALEXANDRA | VA | OICO001 | $12,416.54 | $4,258.26 | $16,674.80 |
| 3445 | LAN FANG FANG | NEW YORK | NY | FANG1688 | $1,560.00 | $535.00 | $2,095.00 |
| 3446 | LAN GAO | FREMONT | CA | LORENGAO | $21,086.00 | $7,231.46 | $28,317.46 |
| 3447 | LAN M LE | WESTMINSTER | CA | TOPLUCKYLADY | $77,777.65 | $26,673.91 | $104,451.56 |
| 3448 | LANCE BREWER | HENDERSON | NV | LANCEBREWER2 | $6,456.69 | $2,214.33 | $8,671.02 |
| 3449 | LANCE D KOEHLER | BURNSVILLE | MN | LANCEK36 | $51,747.11 | $17,746.71 | $69,493.82 |
| 3450 | LANCE GARDUNA | NAPLES | FL | LGARDUNA | $3,824.76 | $1,311.70 | $5,136.46 |
| 3451 | LANCE GONG | BREA | CA | CASHLANCE | $3,882.27 | $1,331.43 | $5,213.70 |
| 3452 | LANCE JONES | PHOENIX | AZ | LANCEJONES | $1,120.68 | $384.34 | $1,505.02 |
| 3453 | LANG V NGUYEN | FOUNTAIN VALLEY | CA | BLUEDIAMOND | $37,743.04 | $12,944.01 | $50,687.05 |
| 3454 | LANIER SAINTIL | TERRYTOWN | LA | LINDCEY1 | $2,313.15 | $793.30 | $3,106.45 |
| 3455 | LANPING LI | PHILADELPHIAP | PA | LILY305 | $2,132.77 | $731.44 | $2,864.21 |
| 3456 | LAPSON LUU | GARDEN GROVE | CA | SUPERCHEAP | $4,391.81 | $1,506.17 | $5,897.98 |
| 3457 | LARA POLEN | PRINEVILLE | OR | HEALTHYFINANCES | $5,723.40 | $1,962.84 | $7,686.24 |
| 3458 | LARISA KAPROVSKAYA | BROOKLYN | NY | PROSPER2U | $2,268.29 | $777.91 | $3,046.20 |
| 3459 | LARISSA NAGIBINA | SARASOTA | FL | EX35 | $2,030.12 | $696.23 | $2,726.35 |
| 3460 | LARRY ALFORD | WATERFORD | MI | LNB | $61,564.67 | $21,113.65 | $82,678.32 |
| 3461 | LARRY B WADE | WEST FRANKFORT | IL | LARRYSWORLD | $4,051.21 | $1,389.37 | $5,440.58 |
| 3462 | LARRY BOWERS | HUNTINGTON | IN | LBOWERS | $1,816.45 | $622.95 | $2,439.40 |
| 3463 | LARRY D PAULEN | FORT WAYNE | IN | THEPAULENGROUP | $10,154.51 | $3,482.50 | $13,637.01 |
| 3464 | LARRY D ROBERTS | ORLANDO | FL | STARBID | $12,620.80 | $4,328.31 | $16,949.11 |
| 3465 | LARRY E. KIRKLAND | WASHINGTON | MD | ZIOERTYE | $3,351.50 | $1,149.40 | $4,500.90 |
| 3466 | LARRY GABOURY | DURAND | MI | GABOURY | $271,722.72 | $93,187.53 | $364,910.25 |
| 3467 | LARRY GILMORE | KATY | TX | LARRYGILMORE | $2,059.52 | $706.31 | $2,765.83 |
| 3468 | LARRY JANSON | HILTON HEAD ISLAND | SC | PROFITBIDS | $14,649.65 | $5,024.11 | $19,673.76 |
| 3469 | LARRY JERREAD | TUCSON | AZ | LARSHAR | $101,909.28 | $34,949.87 | $136,859.15 |
| 3470 | LARRY L MAI | BURLEY | ID | LARMAI1645 | $1,660.35 | $569.42 | $2,229.77 |
| 3471 | LARRY L. ALFONSO | PITTSFIELD | MA | NEWWEALTHVISION | $1,578.92 | $541.49 | $2,120.41 |
| 3472 | LARRY LAUB | LINCOLN | CA | 1LAUBSTER1 | $1,125.05 | $385.84 | $1,510.89 |
| 3473 | LARRY MUIRHEAD | LAKE WORTH | FL | ZBENEFIT | $8,997.44 | $3,085.68 | $12,083.12 |
| 3474 | LARRY P. KEANE | KULA | HI | SURFPEAHI | $6,210.68 | $2,129.96 | $8,340.64 |
| 3475 | LARRY SNIDER | ETIWANDA | CA | LANDJ | $6,123.51 | $2,100.06 | $8,223.57 |
| 3476 | LARRY SPROUSE | BOWLING GREEN | KY | KYTOPGUN | $4,499.66 | $1,543.16 | $6,042.82 |
| 3477 | LARRY VAN HEES | MERIDIAN | ID | LARRYV | $12,509.83 | $4,290.26 | $16,800.09 |
| 3478 | LARRY WERTS | ORLANDO | FL | MAHC | $35,656.50 | $12,228.43 | $47,884.93 |
| 3479 | LARRY ZIMA | HAMMOND | IN | ZMART | $19,975.21 | $6,850.51 | $26,825.72 |
| 3480 | LASHONDA COLEMAN | MIAMI | FL | LASHONDA | $4,189.32 | $1,436.73 | $5,626.05 |
| 3481 | LATONYA THOMPSON | GREENVILLE | SC | THOMPSON1880 | $1,368.09 | $469.19 | $1,837.28 |
| 3482 | LAU HUNGYEE | BAYSIDE | NY | ANNA1888 | $1,134.56 | $389.10 | $1,523.66 |
| 3483 | LAU KWONG HA | ALHAMBRA | CA | LAU881 | $1,713.44 | $587.63 | $2,301.07 |
| 3484 | LAURA B GETTER | ST LOUIS | MO | LAURAGETTER | $2,600.50 | $891.84 | $3,492.34 |

EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| MATTHEW E. ORSO, in his capacity as court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| TODD DISNER, in his individual capacity and in his capacity as trustee for Kestrel Spendthrift Trust; TRUDY GILMOND; TRUDY GILMOND, LLC; JERRY NAPIER; DARREN MILLER;  RHONDA GATES; DAVID SORRELLS; INNOVATION MARKETING, LLC; AARON ANDREWS; SHARA ANDREWS; GLOBAL INTERNET FORMULA, INC.; T. LEMONT SILVER; KAREN SILVER; MICHAEL VAN LEEUWEN; DURANT BROCKETT; DAVID KETTNER; MARY KETTNER; P.A.W.S. CAPITAL MANAGEMENT LLC; LORI JEAN WEBER; and a Defendant Class of Net Winners in ZEEKREWARDS.COM; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | No. 3:14-cv-91 |
| Defendants. | ) ) ) |

## ASSIGNMENT OF JUDGMENT

This ASSIGNMENT OF JUDGMENT (this "Assignment") is made as of the 16th day of December, 2019, by Matthew E. Orso, solely in his capacity as court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com, ("Assignor") to Nationwide Judgment Recovery, Inc. (as the designee of Big Sky Research Bureau, Inc., the "Assignee") pursuant to, and in furtherance of, the arrangements provided for and in that certain Purchase Agreement by and between Assignor and Assignee, dated as of May 30, 2019, as amended (collectively, the "Agreement").

**EXHIBIT E**

NOW THEREFORE, based on the foregoing and for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, transfers and assigns to Assignee, in respect of the above captioned proceedings, all rights and interests of Assignor in and to those certain Judgments entered in the above referenced action at docket number 179, including each of the individual judgments referenced on docket number 179-2, without recourse, representation or warranty, except as provided for in the Agreement.

THE SALES, TRANSFERS AND ASSIGNMENTS PROVIDED FOR HEREIN ARE EXPRESSLY SUBJECT, IN ALL RESPECTS, TO THE TERMS AND PROVISIONS OF THE AGREEMENT, WHICH ARE INCORPORATED HEREIN BY THIS REFERENCE.

This Assignment shall be governed by, and construed in accordance with, the laws of the State of North Carolina.

IN WITNESS WHEREOF, Assignor has executed this Assignment effective as of December 16, 2019.

Assignor:

Matthew E. Orso, not individually, but solely in his capacity as court-appointed Receiver for Rex Venture Group, LLC dba ZeekRewards.com and its Estate

STATE OF North Carolina

COUNTY OF Mecklenburg

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document:

Matthew E. Orso.

(name(s) of principal(s))

Date: December 16, 2019

_____
Notary Public
Print Name: Joan C. Bartley
My commission expires: April 28, 2022

Joan C. Bartley
Notary Public
Mecklenburg County, NC
My Commission Expires Apr. 28, 2022

**EXHIBIT E**