**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| In re:   **LAI KIM HA** | ) | |
| **aka LAI K HA,** | ) | **Chapter 7** |
| | ) | |
| Debtor. | ) | **Bankr. No. 20-72124-PWB** |
| | ) | |
| **NATIONWIDE JUDGMENT** | ) | |
| **RECOVERY, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Adversary No. 21-05027** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **LAI KIM HA** | ) | |
| **aka LAI K HA** | ) | |
| **aka LAIHA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**SUMMARY JUDGMENT**

COMES NOW Nationwide Judgment Recovery, Inc. ("**Plaintiff**"), by and through

undersigned counsel, and submits this *Brief in Support of Plaintiff's Motion for Summary*

*Judgment* against Defendant seeking a finding of non-dischargeability of Plaintiff's debt pursuant

to 11. U.S.C. § 523(a)(19), and shows as follows:[1]

**SUMMARY OF ARGUMENT**

Section 523(a)(19) makes debts resulting from judgments "for the violation of securities

laws" or for fraud "in connection with the purchase and sale of securities" non-dischargeable.  The

Defendant's debt independently satisfies both provisions.  First, the debt arose from (and would

---

[1] Filed contemporaneously herewith, and in support hereof, are the following: (1) *Plaintiff's Motion for Summary Judgment as to Dischargeability of Certain Debt* (the "**Motion**"); and (2) Plaintiff's *Statement of Material Facts Not in Dispute*.

not exist but for) the securities violations of RVG (defined below).  Per the Eleventh Circuit's

decision in *Lunsford v. Process Techs. Servs., LLC*, this satisfies section 523(a)(19)(A)(i) and,

thus, renders the debt non-dischargeable.  Second, the debt is independently non-dischargeable

under section 523(a)(19)(A)(ii) because it arose from fraud in connection with the purchase or sale

of securities. The debt, memorialized in a judgment finding Defendant liable for violations of the

NCUFTA (defined below), arose from Defendant's investment in an illegal Ponzi scheme that

promised to generate outsized returns exclusively from the efforts of those that operated the

scheme. Thus, the underlying transactions giving rise to the debt constitute securities as defined

by the Bankruptcy Code and Supreme Court precedent, providing an independent basis for non-

dischargeability under section 523(a)(19)(A)(ii).

## FACTUAL BACKGROUND

This adversary proceeding derives from the judgment entered against the Defendant as a

result of the Defendant's participation in a complex Ponzi scheme.  The scheme, operated by Rex

Venture Group, LLC ("**RVG**") and RVG executives through a website called ZeekRewards,

involved hundreds of thousands of participants and several hundreds of millions of dollars.  *Bell*

*v. Disner*, Western District of North Carolina, Case No. 3:14CV91 (the "**Net Winner Class**

**Action**"), D.I. 142 (the "**Summary Judgment Order**"), at 1-2.[2]  A true and correct copy of the

Summary Judgment Order is attached hereto as __Exhibit A__.  Essentially, RVG solicited investors

to participate in an advertising scheme for an affiliate website, www.Zeekler.com, that operated

penny auctions. *Id.* at 4.  RVG promised significant daily profit-share awards to participants who

---

[2] The operative facts in this case are drawn from the Summary Judgment Order entered by the Honorable Graham C.
Mullen, United States District Judge for the Western District of North Carolina in the Net Winner Class Action, as
well *Securities and Exchange Commission v. Rex Venture Group, LLC d/b/a/ ZeekRewards.com, and Paul R.* Burks,
Western District of North Carolina, Case No. 3:12CV519 (the "**SEC Action**").  It is appropriate for the Court to take
notice of and consider the Summary Judgment Order, the dockets of both the Net Winner Class Action and SEC
Action, as well as other pleadings from those proceedings that are attached hereto.  *See* Fed. R. Evid. 201(b)(2); *In re*
Kennedy, 2021 WL 1396565, at *4 (Bankr. N.D. Ga. April 13, 2021).

125847026v2

purchased and sold or purchased and gave away at least ten penny auction bids per day and posted a free daily advertisement for Zeekler.com. *Id.* at 9. Participants earned daily dividends, the amount of which depended on the number of points they earned from the purchase of compounding penny auction bids. *Id.* RVG also rewarded investors for recruiting new participants through a program called "Matrix," pursuant to which investors who enrolled new members in monthly subscription plans earned bonuses and commissions for all downstream subscriptions. *Id.* at 16. Few participants ever turned a profit, and those that did were paid with revenue generated by later investors in the scheme. *Id.* at 2.

Based on these facts, the Securities and Exchange Commission ("**SEC**") filed suit against RVG and its owner, Paul Burks, in 2012, raising claims for the unregistered offer and sale of securities, fraud in the offer or sale of securities, and fraud in connection with the purchase or sale of securities, all in violation of the Securities Act and the Exchange Act. SEC Action, D.I. 1 ("**SEC Complaint**"), at ¶¶ 59–68. A true and correct copy of the SEC Complaint is attached hereto as **Exhibit B**. The complaint sought, among others, orders permanently enjoining RVG and Burks from violating these securities laws, freezing defendants' assets, and requiring RVG to disgorge all ill-gotten gains, and the appointment of a temporary receiver over RVG's assets. *Id.* at 18–20. Following Defendants' consent to entry of judgment, the court appointed a Temporary Receiver to RVG's estate. *See* SEC Action, D.I. 4.

The Receiver filed a "clawback" action in the Western District North Carolina, seeking to recover funds illegally obtained by those who received more money from the scheme than they paid in (the "**Net Winners**" or the "**Net Winner Defendant Class**"). *See* Net Winner Class Action, D.I. 1. The Receiver's complaint raised claims for fraudulent transfer, in violation of the North Carolina Uniform Fraudulent Transfer Act ("**NCUFTA**"), and common law fraudulent

transfer, and sought the imposition of a constructive trust with respect to any funds or assets from the Receivership Estate. *Id.* at ¶¶ 151-77.  Following the certification of the defendant class, the court entered final judgment against certain Net Winner Class members, including the Defendant. *See* Net Winner Class Action, D.I. 178.  As a member of the Net Winner Defendant Class, a final judgment was entered against Defendant ordering her to pay $78,382.12 —a sum representing her total winnings from the scheme and prejudgment interest.  Net Winner Class Action, D.I. 17-2, p.3437 of 6861 (the "**Judgment**").  A true and correct copy of the Judgment is attached hereto as **Exhibit C**.  On December 17, 2019, the Receiver assigned to Plaintiff the full portfolio of judgments from the RVG scheme, including the Defendant's Judgment.  A true and correct copy of the assignment of judgment is attached hereto as **Exhibit D**.

Defendant filed for relief under Chapter 7 of the Bankruptcy Code on November 27, 2020. *See* Case. No. 20-72124.  Seeking to prevent the bankruptcy court from discharging the debt, Plaintiff initiated this adversary proceeding, contending that the debt is exempt from discharge under both sections 523(a)(19) and (a)(2)(A) of the Bankruptcy Code.  (D.I. 1).  As stated in its Motion, Plaintiff now seeks a summary judgment order finding that the debt is non-dischargeable pursuant to section 523(a)(19).

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56, made applicable to bankruptcy practice by Federal Rule of Bankruptcy Procedure 7056, governs summary judgment motions. Summary judgment is appropriate when the evidence of record reflects no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. Rule 56(c). In analyzing a motion for summary judgment, the Court must view all the evidence and factual inferences drawn therefrom in a light most favorable to the nonmoving party. *See Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). The moving party bears the initial burden of showing no such issues

125847026v2

exist. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265

(1986). However, Rule 56(e) provides that:

> When a motion for summary judgment is made and supported as provided
> in this rule, an adverse party may not rest upon the mere allegations or
> denials of the adverse party's pleading, but the adverse party's response, by
> affidavits or as otherwise provided in this rule, must set forth specific facts
> showing that there is a genuine issue for trial. If the adverse party does not
> so respond, summary judgment, if appropriate, shall be entered against the
> adverse party.

Thus, once the moving party has met its burden, the burden shifts to the nonmoving party to

establish specific facts showing that there is a genuine issue for trial. *See Allen*, 121 F.3d at 646.

## ARGUMENT AND CITATION OF AUTHORITY

## I.    THE JUDGMENT IS NON-DISCHARGEABLE PURSUANT TO SECTION 523(A)(19)

Section 523(a)(19) renders nondischargeable debts arising from securities law violations

and fraud in connection with the purchase or sale of securities.  Specifically, this section provides

that a discharge under section 727 does not discharge a debt that:

> (A) is for-
> > (i) the violation of any of the Federal securities laws, . . . any of the
> > State securities laws, or any regulation or order issued under such
> > (ii) common law fraud, deceit, or manipulation in connection with
> > the purchase or sale of any security; and
> (B) results, before, on, or after the date on which the petition was filed, from
> > (i) any judgment, order, consent order, or decree entered in any
> > Federal or State judicial or administrative proceeding;
> > (ii) any settlement agreement entered into by the debtor; or
> > (iii) any court or administrative order for any damages, fine,
> > penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost,
> > or other payment owed by the debtor.

11 U.S.C. § 523(a)(19).  In other words, section 523(a)(19) excepts debts if the following two

conditions are met: (1) the debt is for the violation of federal or state securities laws or regulations;

and (2) the debt is memorialized in a judicial or administrative decision or a settlement agreement

- 5 -

125847026v2

arising on, before, or after the bankruptcy filing.  *In re Whitcomb*, 303 B.R. 806, 810 (Bankr. N.D. Ill. 2004).

Importantly, the Eleventh Circuit held in *Lunsford v. Process Techs. Servs., LLC* that "section 523(a)(19)(A) precludes discharge regardless of whether the debtor violated securities laws as long as the securities violation caused the debt."  848 F.3d 963, 968 (11th Cir. 2017). Stated differently, "section 523(a)(19)(A) unambiguously prevent[s] discharge of debts 'for the violation' of securities laws irrespective of debtor conduct" so long as the debt arises from a securities violation by a third party.  *Id.* at 968.

The Eleventh Circuit's interpretation of the phrase "debt that is for" and its consequential holding comports with the Supreme Court's interpretation of the phrase "debt for."  *See id.*  In *Cohen v. de law Cruz*, the Supreme Court explained that "'debt for' is used throughout" section 523(a) "to mean 'debt as a result of,' 'debt with respect to,' 'debt by reason of' and the like." 523 U.S. 213, 220 (1998) (citing American Heritage Dictionary 709 (3d ed. 1992); Black's Law Dictionary 644 (6th ed. 1990)). While *Cohen* specifically analyzed the meaning of a different section 523(a) exception, it held that, as a general matter, "debt for" "connot[es] broadly any liability arising from the specified object."  *Id.* (emphasis added) (holding that exception for liability arising from "money obtained by . . . fraud" applied to treble damages incurred as result of the fraudulent acquisition of funds, not only to the value of the funds obtained through the fraudulent scheme).

A.      **Defendant's Debt is Non-Dischargeable Under Section 523(a)(19)(i) Because It Arose From A Violation of Securities Laws.**

The undisputed facts of this proceeding show that Defendant's debt is a direct result from her participation in a Ponzi scheme that operated in violation of securities laws and arises from her receiving a benefit from the securities violation of another.  The debt at issue in this case is

inextricably intertwined with the SEC's prosecution of those who organized the ZeekRewards Ponzi scheme and committed securities violations. The judgment arose directly from the Summary Judgment Order, entered on November 29, 2016. *See* Summary Judgment Order. The Summary Judgment Order was expressly premised on the SEC's case against RVG and Burks, in which the Western District of North Carolina determined that the ZeekRewards scheme operated as a Ponzi and pyramid scheme, *id.* at 2, which in turn required the appointment of a Receiver to recover fraudulent transfers related to the scheme. *Id.* This instant judgment debt is one of those fraudulent transfers that the Receiver was obligated to recover for the Receivership Estate. As the district court explained, "Because Zeek's net winners 'won' the victims' money in an unlawful combined Ponzi and pyramid scheme, the net winners are not permitted to keep their winnings and must return the fraudulently transferred winnings to the Receiver for distribution to Zeek's victims." *Bell v. Disner*, No. 3:14CV91, 2014 WL 6978690, at *2 (W.D.N.C. Dec. 9, 2014). In sum, Defendant should not be permitted to illegally profit from securities violations and then shield those profits from her creditors in a manner section 523(a)(19)(A)(i) was specifically designed to avoid. *See Smith v. Gibbons (In re Gibbons)*, 289 B.R. 588, 592-93 (Bankr. S.D.N.Y. 2003) (noting that it was Congress' intent to apply section 523(a)(19) as broadly as possible in pending bankruptcy cases to ensure that bankruptcy laws are not used as a shield and to permit victims of fraudulent schemes to recover as much as possible).

Section 523(a)(19)(B) is also satisfied because the debt is memorialized in a judgment. *See* Judgment. Therefore, the debt is nondischargeable pursuant to section 523(a)(19) because it arose from a securities violation and is memorialized in a judgment.

125847026v2

**B.     Alternatively, Defendant's Debt is Non-Dischargeable Under Section 523(a)(19)(A)(ii) Because It Arose From Common Law Fraud In Connection With Securities Transactions.**

As an independent basis for non-dischargeability, section 523(a)(19)(A)(ii) excepts debts that are for "common law fraud, deceit, or manipulation in connection with the purchase or sale of any security." 11 U.S.C. § 523(a)(19)(A)(ii). As explained below, the instant debt resulted from a judicial finding that Defendant's participation in the ZeekRewards Ponzi and pyramid scheme involved fraudulent transfers made in violation of the NCUFTA. Therefore, even if Defendant's debt is not excepted from discharge under subsection (A)(i), it clearly falls within the scope of this independent provision.

1.     Defendant's Debt Results from Fraudulent Acts.

The complaint in the Net Winner Class Action charged Defendant, as a member of the Net Winner Class, with violations of the NCUFTA, which permits a receiver to avoid transfers made "with the intent to hinder, delay, or defraud any creditor of the debtor," within four years of the transfer itself.  N.C. Gen. Stat. § 39-23.4(a)(1); 39-23.1; 39-23.9.  *See* Net Winner Class Action, D.I. 1 at ¶¶ 151–162. In ruling that the Net Winners had violated NCUFTA, the district court relied on the "Ponzi scheme presumption," pursuant to which "the intent to defraud can be presumed when transfers are in furtherance of a Ponzi scheme." Summary Judgment Order at 21–22. Based on the district court's recognition "that ZeekRewards operated as a Ponzi scheme" it concluded that "the law considers transfers from the scheme to be fraudulent transfers that may be avoided under the NCUFTA." *Id.* at 22. Therefore, it cannot be disputed that the first condition of § 523(a)(19)(A)(ii)—that the debt result from fraudulent acts—is satisfied here. *See In re Chan*, 355 B.R. 494, 503 (Bankr. E.D. Pa. 2006) ("The merits of the § 523(a)(19) discharge exception are indistinguishable from the merits of the underlying legal claim.").

- 8 -

2.    <u>Defendant Committed NCUFTA Violations in Connection with the Purchase or Sale of Securities.</u>

The Bankruptcy Code defines "security" expansively to include, among others, an "investment contract or certificate of interest or participation in a profit sharing agreement . . . if such contract or interest is required" to be registered under "the Securities Act of 1933, or is exempt under section 3(b) of such Act from the requirement to file such a statement." 11 U.S.C. § 101.  In *SEC v. W.J. Howey Co*., 328 U.S. 293 (1946), the Supreme Court considered what constitutes an "investment contract" under the Securities Act. 328 U.S. at 298. The Court recognized that the term has "been broadly construed to afford the investing public a full measure of protection." *Id*. The Court held that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id*. at 298-99. The Court explained that this expansive definition was necessary "to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id*. at 299. Thus, when deciding whether a particular transaction is an "investment transaction," "courts should look beyond the formal terms of the arrangement and assess whether the reasonable expectation was one of significant investor control, or third-party control over the investor's funds." *Saunders v. Morton*, 269 F.R.D. 387, 394 (D. Vt. 2010) (concluding that an investment contract existed where plaintiff delivered to defendants a sum on the expectation "that he would receive profits based on investments conducted by others on his behalf").

In the Eleventh Circuit, "'[t]he three elements of the [Howey] test are: "(1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others."'  *Alunni v. Dev. Res. Grp., LLC*, 445 F. App'x 288, 295 (11th Cir. 2011) (internal quotation omitted).

125847026v2

Here, all of the *Howey* elements are satisfied.  First, the Defendant invested money in the ZeekRewards scheme.  An "investment" involves "g[iving] up some tangible and definable consideration in return for an interest that ha[s] substantially the characteristics of a security." *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 560 (1979).  Defendant paid RVG a sum of money to participate in a scheme that promised to generate substantial revenue for participants.  This was clearly not a commercial transaction.  *See Kansas State Bank in Holton v. Citizens Bank of Windsor,* 737 F.2d 1490, 1495 (8th Cir. 1984) (noting that the first *Howey* element requires distinguishing investments from commercial transactions). In return, she expected to receive (and did in fact receive) future profits.

Second, the scheme was a "common enterprise" because it relied on pooling the interest of the scheme's operators and its investors, as well as pooling the profits generated by the individual investments in furtherance of the scheme.  *See S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999) ("the fact that an investor's return is independent of that of other investors in the scheme is not decisive. Rather, the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [promoter].") (internal quotation omitted).

The third *Howey* element is also satisfied here.  The third *Howey* element requires proof that the investment was made with the "expectation of profits to be derived solely from the efforts of others." *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir.1999).  Importantly, "solely" is not to be interpreted or applied restrictively.  *See id.*  Instead, the inquiry looks "to the economic reality, focusing on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other party." *Id.* (quotation omitted).  "An investor who has the ability to control the profitability of his investment, either by his own efforts or by majority vote in group

- 10 -

ventures, is not dependent upon the managerial skills of others." *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir.1982). "The investor must have no reasonable alternative to reliance on that person." *Id*. at 741–42 (internal quotation omitted).

Here, the scheme attracted investors by boldly claiming that it paid "up to 50% of the company's daily net profits in the form of daily profit share awards." SEC Complaint at ¶ 42. ZeekRewards enticed investments with the following description of the scheme: "What if you found a very simple and quick way to earn 125% profit on the dollars you spend with us without ever having to sell a thing or recruit a soul?" Summary Judgment Order at 7.  Recruiting emails explained that ZeekRewards was a new kind of loyalty program and "if you've ever wanted to each 5 figures or more monthly, passively, then this is your chance." *Id.*  This third *Howey* element is easily satisfied here because RVG and Burks advertised the scheme to participants, like the Defendant, as a way of passively earning outsized returns on their investments.

Further, Defendant clearly intended to profit from the operational efforts of RVG and Burks, who "update and operate the websites, handle all payments, manage the bank accounts and payment service providers, manage affiliate and customer accounts, manage all affiliate and customer services, oversee and disburse all bids, operate the auctions, create all advertisements, sponsor recruiting videos and calls, . . . and decide the daily payout percentages."  SEC Complaint at ¶ 23. Although here, Defendant and other participants earned points, the number of which dictated the amount of their daily awards, by placing free advertisements for the penny auction website on classified ad websites, recruiting new investors to the scheme, and purchasing and/or giving away bids to new customers, none of these activities change the fact that the vast majority of the operation and the revenue derived therefrom resulted from the work of RVG and Burks. As the SEC alleged and the district court determined, an investor's responsibilities could all be

completed with minimal effort, because RVG and Burks created automated programs to facilitate these activities. SEC Complaint at ¶¶ 21, 25-27; Summary Judgment Order at 15-16. Further, with respect to the daily advertisement, RVG created the advertisement and specifically told investors that the process "should take no more than five minutes per day." SEC Complaint at ¶ 27. And although investors were required to recruit new members to the scheme, courts have held that the final *Howey* element is satisfied where investors' profits depended on recruiting efforts. *See, e.g., Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 784 (9th Cir. 1996); *S.E.C. v. Int'l Heritage, Inc.*, 4 F. Supp. 2d 1368, 1373 (N.D. Ga. 1998); *see also* Net Winner Class Action, D.I. 90[3] ("Defendants' emphasis upon the long hours they worked to recruit other others is misplaced. Without the essential managerial efforts of Burks and RVG, no profits would have been generated at all.").

Therefore, all of the *Howey* elements are easily satisfied here. Defendant participated in the ZeekRewards scheme with the expectation of earning outsized returns on her investment. Although she may have exerted minimal effort in advertising the scheme and recruiting new members, those efforts pale in comparison to the efforts of RVG and Burks in operating the scheme, managing profits, and distributing awards. Because Defendant's judgment debt results from a judicial determination that she violated NCUFTA by participating in the scheme, and because that scheme involved the purchase of securities as defined by the Bankruptcy Code and Howey, the debt is not dischargeable under § 523(a)(19)(A)(ii).

## CONCLUSION

Based on the undisputed material facts, Nationwide requests that the Court enter an order: (a) adjudicating that the debt is non-dischargeable under section 523(a)(19)(A)(i); (b) adjudicating

---

[3] *Bell v. Disner*, 2014 WL 6978690, at *4 (W.D.N.C. Dec. 9, 2014)

125847026v2

that the debt is non-dischargeable under section 523(a)(19)(A)(ii); and (c) granting such other relief as is appropriate.

Respectfully submitted on this 2nd day of May, 2022.

By: /s/ *Nathaniel T. DeLoatch*

Nathaniel T DeLoatch, Bar No. 216330
TROUTMAN PEPPER HAMILTON
SANDERS LLP
Bank of America Plaza
600 Peachtree Street NE
Suite 3000
Atlanta, GA  30308-2216
Telephone:   404.885.3000
Facsimile:    404.885.3900

- 13 -

125847026v2

**<u>Exhibit A</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14CV91

| | | |
|---|---|---|
| KENNETH D. BELL, in his capacity as a court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| TODD DISNER, in his individual capacity and in his Capacity as trustee for Kestrel Spendthrift Trust; TRUDY GILMOND; TRUDY GILMOND, LLC; JERRY NAPIER; DARREN MILLER; RHONDA GATES; DAVID SORRELLS; INNOVATION MARKETING, LLC; AARON ANDREWS; SHARA ANDREWS; GLOBAL INTERNET FORMULA, INC; T. LEMONT SILVER; KAREN SILVER; MICHAEL VAN LEEUWEN; DURANT BROCKETT; DAVID KETTNER; MARY KETTNER; P.A.W.S. CAPITAL MANAGEMENT LLC; LORI JEAN WEBBER; and a Defendant Class of Net Winners in ZEEKREWARDS.COM, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the Court upon the Receiver's Motion for Summary Judgment Against Remaining Named Defendants and Partial Summary Judgment Against the Net Winner Class. The matter is fully briefed and ripe for consideration.

## I.    FACTUAL BACKGROUND AND UNDISPUTED FACTS

### A. Procedural History of the SEC Action and this Litigation

This "clawback" litigation was initiated by the Receiver of Rex Venture Group, LLC ("RVG"), a Nevada limited liability company with its former principal place of business in Lexington, North Carolina. The Complaint alleges as follows: Paul Burks, the owner and former top executive of RVG, and other management insiders used RVG in their operation of a

1

massive Ponzi and pyramid scheme through ZeekRewards ("Zeek") from at least January 2011

until August 2012. Compl. at ¶¶ 1, 6–9. Over 700,000 participants lost over $700 million dollars

in the scheme. *Id.* at ¶ 1. Burks and the management insiders used ZeekRewards to promise

substantial payouts and outsize returns to all participants, but few actually benefitted. *Id.* at ¶ 2.

Those who did benefit were paid not with profits from a legitimate retail operation, but rather

from money paid in by later investors in the scheme.  *Id.* at ¶ 3.  The largest "net winners" (those

who received more money from Zeek than they paid in to Zeek) each received well over a

million dollars, and many others received hundreds of thousands of dollars. *Id.* at ¶¶ 2, 12–25.

On August 17, 2012, the Securities and Exchange Commission filed an action in this

Court, *Securities and Exchange Commission v. Rex Venture Group, LLC d/b/a ZeekRewards.com

and Paul Burks*, Civil Action No. 3:12-cv-519 (the "SEC Action"), to obtain injunctive and

monetary relief against Paul Burks, shut down the ZeekRewards Ponzi and pyramid scheme,

freeze RVG's assets, and seek appointment of a Receiver for RVG. *Id.* at ¶ 26. Also on August

17, RVG, through Burks, admitted to this Court's jurisdiction over RVG and the subject matter

of the SEC action, and it consented to entry of judgment in favor of the SEC. *SEC Action*, Doc.

No. 5 at ¶¶ 1–2. As a result, the Court entered consent judgments against RVG and Burks

enjoining them from violating the federal securities statutes or participating in, or facilitating, the

solicitation of any investment in any security or in the offering of a security. *SEC Action*, Doc.

Nos. 6, 8.

That same date, in an Agreed Order Appointing Temporary Receiver and Freezing Assets

of Defendant Rex Venture Group, LLC (the "Agreed Order"), this Court appointed Kenneth D.

Bell as the Receiver over the assets, rights, and all other interests of the estate of Rex Venture

Group, LLC, d/b/a www.ZeekRewards.com and its subsidiaries and any businesses or business

names under which it does business (the "Receivership"). Compl. at ¶ 27. The Order authorized

and directed Mr. Bell as RVG's Receiver to institute actions and legal proceedings seeking the

avoidance of fraudulent transfers, disgorgement of profits, imposition of constructive trusts and

any other legal and equitable relief that the Receiver deems necessary and appropriate to

preserve and recover RVG's assets for the benefit of the Receivership Estate. *Id.* Within 10 days

of his reappointment on December 4, 2012, the Receiver filed the original Complaint and Agreed

Order in the SEC Action in all of the United States District Courts pursuant to 28 U.S.C. § 754

giving this Court jurisdiction over RVG's property in every federal district.[1]

The Receiver filed this clawback action on February 28, 2014, asserting claims of relief

against Defendants for: (1) Fraudulent Transfer of RVG Funds in Violation of the North Carolina

Uniform Fraudulent Transfer Act ("NCUFTA"); (2) Common Law Fraudulent Transfer; and (3)

Constructive Trust. Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1)(A) and (B),

the Receiver moved on July 30, 2014 to certify a defendant class consisting of all persons or

entities who were "Net Winners" in ZeekRewards in an amount in excess of one thousand

dollars ($1,000) (the "Net Winner Class").[2] *See* Doc. No. 68. Net Winner Class members are

defined as those ZeekRewards participants who received more money from RVG/ZeekRewards

(as "profit payments," "commissions," "bonuses" or any other payments) than was paid in to

RVG/ZeekRewards for the purchase of "bids," monthly "subscriptions," "memberships," or

other fees. Each of the named Defendants in this action won in excess of $900,000 (either

---

[1] This Court has previously ruled that the Receiver has standing to bring the claims asserted against the Defendants and this Court has subject matter jurisdiction over this action and personal jurisdiction over the Defendants. *Order dated December 9, 2014* (Doc. No. 90).

[2] Excluded from the Net Winner Class in this action were persons or entities that have entered into a settlement agreement approved by this Court or who resided outside the United States at the time of their participation in ZeekRewards.

3

individually or together with another family member or through their shell corporation). Compl. at ¶ 2.

In February 2015, this Court certified the Net Winner Class under both Rule 23(b)(1)(A) and (b)(1)(B), noting that "the efficiency of one action in which all parties can argue their case and assert their rights will benefit both the Receiver and small winners," consistent with the intent of the rules permitting class actions. *See* Doc. No. 101. The common class questions to be resolved with respect to the Net Winner Class include "whether ZeekRewards operated as a Ponzi and/or pyramid scheme" and "whether the payments from ZeekRewards to class members are fraudulent transfers that must be disgorged and repaid." *Id*. at 4-5. On September 14, 2015, the Court appointed Kevin Edmundson as class counsel and subsequently the Court authorized the Defendant Class to engage an expert witness, Berkeley Research Group ("BRG"), at the primary expense of the Receivership.

### B. The Ponzi Scheme

Beginning at least as far back as 2000, Paul Burks operated a number of generally unsuccessful multi-level marketing businesses through Rex Venture Group, LLC (and related entities). In 2010, RVG launched Zeekler.com, a so-called "penny auction" website where items ranging from personal electronics to cash were auctioned to bidders. A "penny auction" does not work like a typical auction. In a normal auction, it costs nothing to bid, and the auction price rises based on the amount of the bid until there is no higher bid or the amount of time set for the auction expires. In a "penny auction," bids must be purchased by bidders (e.g., for $1 per bid), and each incremental bid placed raises the amount of the total price of the auction item only by $0.01. Penny auctions have a timer, but unlike a typical auction, each new bid at the end of the timer resets the bid clock, usually for 30 seconds to a minute. The penny auction ends when the

4

bid clock expires with no new bid. The winner then pays the auction price (plus the cost of bids used), which is typically well below the retail price. However, the unsuccessful bidders lose all the money they spent to purchase bids.

During 2010, the Zeekler penny auctions were not very successful. RVG's fortunes changed in 2011 when RVG launched a new money-making scheme – ZeekRewards. RVG promoted ZeekRewards as Zeekler.com's "private, invitation-only affiliate advertising division." Bell Aff. at Ex. 4.  In reality, ZeekRewards was just a multi-level marketing scheme grafted onto the Zeekler business. It purported to pay a portion of the alleged "profits" from the Zeekler penny auction business to participants who earned bid balances or points, primarily by buying auction bids. RVG told potential participants that "Zeekler tallies total sales and pays a percentage to all active ZeekRewards members." *Id*. at Ex. 5. Also, participants in ZeekRewards, called "Affiliates," were paid for recruiting other participants in a pyramid "multi-level" sales format.

Bidders on the Zeekler penny auctions could purchase bids at retail for $0.65, or they could acquire bids as ZeekRewards affiliates (or as free samples from RVG or an affiliate). ZeekRewards affiliates paid $1 for what RVG variously referred to as "compounding," "sample" or "VIP" bids. The retail bids and the compounding / sample / VIP bids all had the same effect in the auctions – placing a bid raised the price of an auction item by one cent. However, bids bought through ZeekRewards rather than as retail bids were more valuable because purchasing those bids gave the affiliates "points" that supposedly entitled Affiliates to a portion of the profits from the business. This was the real (and only) reason Affiliates would pay $1 for auction bids they could buy for $.65. *See* Brockett Dep. at 77-78.

Further, ZeekRewards made clear that even though bids bought through ZeekRewards could be used in the auctions, that fact was irrelevant to the multi-level marketing scheme. Affiliates were told that using the bids in the auction would have no effect on their all-important bid or points balance ("Each time you buy a Compounding Bid in your ZeekRewards Back Office a bid is added to the Compounding bucket. *Spending the bid in an auction does not remove it from the bucket.*") (emphasis added). Bell Aff. at Ex. 7. Not surprisingly, even though a largely bogus "bid giveaway requirement" was added later in the scheme, relatively few ZeekRewards participants or "bid giveaway" recipients used their sample/VIP bids in the Zeekler auctions. Prior to shutdown, RVG estimated that only approximately 19 million VIP bids were used in auctions out of over 7 billion VIP bids created – less than 1/3 of 1%. *See*, *e.g.*, *Id*. at Ex. 8.

From the beginning, RVG intended to use "bids" in ZeekRewards not as a product but as a proxy for money deposited into the program. Quickly, RVG's focus changed from Zeekler to ZeekRewards, which was the source of nearly all the company's income. Relative to ZeekRewards, little or no money was made in the Zeekler "penny auction" business.

The sale of compounding / sample / VIP bids in ZeekRewards dwarfed the sale of "retail" bids. According to the ZeekRewards database, ZeekRewards sold approximately $820 million in compounding / sample / VIP bids, but only about $10 million in retail bids were sold. *See* Turner Report at 8. While over $400 million dollars was paid out to ZeekRewards Affiliates over the course of the scheme, the money used to fund ZeekRewards' distributions to Affiliates came almost entirely from new participants rather than income from the Zeekler penny auctions. *Id*. at Exhibit E. Only about $10 million dollars in retail bids were sold (of which $2.3 million reflected

6

purchases by net losing Affiliates). So, the "profit" from the penny auction business, if there was

any at all, could not have supported even 3% of the total payments made to participants.

Burks and the other Insiders were aware that the payouts to Affiliates would be funded by

new participants rather than retail profits from the penny auctions. Dawn Wright-Olivares

excitedly told Burks early in the scheme, "I think we can blow this OUT together- we've already

attracted a great many big fishes." Bell Aff. at Ex. 4.

ZeekRewards succeeded because it promoted a lucrative "compensation plan," offering

large amounts of passive income to entice individuals to participate in the scheme. The

participants in the ZeekRewards scheme invested money in the scheme by buying so-called

"bids/points," "memberships," "subscriptions," customer names, and other items related to the

scheme. The compensation plan consisted primarily of two components: (1) the "Compounder,"

also known as the "Retail Profit Pool" or "RPP," which supposedly allowed participants to

collectively share up to 50% of Zeek's net retail profits and receive a 125% return on investment;

and (2) the "Matrix," which was a multi-level marketing commission program.

Initially, ZeekRewards promised a 125% return on a passive investment, describing the

program as follows: "What if you found a very simple and quick way to earn 125% profit on the

dollars you spend with us without ever having to sell a thing or recruit a soul?" *Id.* at Ex. 10.

Another pitch touted the income participants would receive: "I found something I believe is

absolutely out of this world . . . it's called the 'Compounder' and "grows income for you by

compounding it daily;" . . . "the new system [lets] you earn every 24 hours and can generate for

you 4 or 5 figures or more per month . . . ." "[I]f you've ever wanted to earn 5 figures or more

monthly, passively, then this is your chance." *Id.* at Ex. 11. Similarly, de Brantes boasted that by

7

participating in ZeekRewards: "Many are currently receiving $2,000 to $3,000 per month

PASSIVELY." (emphasis in original). *Id.* at Ex. 12.

Early ZeekRewards participants were told to expect profit shares of .5% to 4% daily. *Id.*

at Ex. 10. The first day the Compounder share percentage was allocated to participants was

January 20, 2011, and the share percentage was 3.24%. *Id.* at Ex. 13. As the scheme progressed,

participants continued to be told to expect large, consistent daily returns. On May 14, 2011, Paul

Burks told Michael VanLeeuwen ("Coach Van") that "our goal has always been 1% Mon-Thurs

and 1/2% weekends, Fri- Sun. We have always maintained those averages and exceeded them

often." *Id.* at Ex. 14.

And, even after counsel advised against publicly promoting a 125% return, RVG

continued to tell Affiliates and prospects to expect large returns. For example, de Brantes told an

affiliate in July 2011:

> [O]ur average has been between 1.6–1.8% which would actually be a great deal
> more than 125%.  The attorneys our [sic] advising us on what we can and can't
> say and now it's our job to figure out how much we need to pay daily to get
> everyone exactly what we intend to give (it makes it a little tricky but it is our
> intention to maintain a system that pays 125% without saying it anywhere on the
> site). …Right now we're still working on the 125% cap system. We just aren't
> saying 125%.

*Id.* at Ex. 15.

Therefore, Affiliates paid and invested money into ZeekRewards with the expectation

that they would profit from their payments based on the success of the company's operations. All

the income received by ZeekRewards and Zeekler, regardless of source, was pooled and

comingled in a cast of financial institutions that changed as the scheme evolved or as financial

companies refused to work with RVG.

8

Although the specifics and the terminology of the ZeekRewards "Compensation Plan" changed from time to time as Burks and the other Insiders tried to prolong and prop up the scheme, the two pillars of the plan for most Affiliates were always: (1) "profit" sharing (first called the Compounder then later the Retail Profit Pool (or "RPP")) and (2) the multi-level marketing pyramid that paid Affiliates a "commission" on the membership fees paid by recruited "downline" Affiliates (known as the Matrix).

ZeekRewards' Affiliates' primary money making tool was the "Compounder." To participate in the Compounder, Affiliates purchased "compounding" bids, which earned Affiliates one point for each "compounding" bid that they purchased from the company. To become an Affiliate "qualified" to receive points required little or no effort, despite the bogus claim that Affiliates "earned" points. As discussed in more detail below, Affiliates were required to place daily one free digital ad (generally prepared by the company) for Zeekler.com. Later, Affiliates were told they needed to "give away" the bids in order to obtain points, although in practice this so-called "requirement" was easily met: Affiliates could simply pay extra to have the company "give away" the bids for them. *Id*. at Ex.16. In effect this was, in turn, just yet another revenue source for the company.

As the inducement to purchase these "compounding" bids, ZeekRewards told Affiliates that the company would give a portion of the company's daily earnings or profits (often claimed to be 50%) to point-holding Affiliates. The size of the daily "profit sharing" payment each affiliate received through the Compounder was based upon the number of points the affiliate held in his or her account. The size of each Affiliate's daily award depended only on the Affiliate's point total. Thus, regardless of the Affiliates' efforts, buying more points resulted in a larger profit share, just like having more shares of stock results in a larger dividend for a stockholder.

9

ZeekRewards described the "Compounder" process as follows: "At the end of each business day (7 days a week) the company determines its daily overall profitability and rebates a percentage back to its Active Advertising Affiliates based on each individual Premium Members Compounder Bid Balance." *Id*. at Ex. 4. Each day, affiliates had a choice to be paid all or a portion of the so-called "profit" award in cash or to use the "cash" award to buy more bids/points, which then added to the bid / points balance and "compounded" as the daily percentage awards were made. Burks and the other insiders understood that the compensation plan would be unsustainable in both the short run and the long run because there would not be enough new participants to support full daily cash payments to a growing number of existing Affiliates. *See*, *e.g.*, Turner Report at Exhibit G, p.15.

Prior to the shutdown of ZeekRewards, there were over 3 billion VIP bid points in the ZeekRewards system. *See Id.*  Based on the actual average daily "profit" percentage of 1.43% used during the scheme, the daily "profit" award to Affiliates would be over $40,000,000 on 3 billion points. The amount of money paid in to ZeekRewards daily was far less than $40 million. Therefore, if RVG had been required to pay the daily awards supposedly available to Affiliates in cash, ZeekRewards would have quickly collapsed. Specifically, during the last month ZeekRewards operated (July 16, 2012 to August 15, 2012) the daily average RPP award purportedly available to participants was $38,237,036, but the daily receipts (from all sources, not just retail auctions) were much smaller, averaging approximately $9,722,000. *See Id.*  Thus, not only were the ZeekRewards payouts made from the money put in by other participants, but the so-called "profit" awards greatly exceeded total receipts, which, of course, was unsustainable.

10

To maintain the program for as long as possible and generate the most income, ZeekRewards actively discouraged Affiliates from requesting actual payment of all their profit awards in cash. Instead, Affiliates were encouraged to let their balances "compound" and only take 20% or less of their "earnings." Bell Aff. at Ex. 17.

ZeekRewards eventually changed the name of the Compounder to the "Retail Profit Pool," or "RPP." In addition, they changed the name of compounding bids to "VIP bids" or "sample bids." However, while the names changed, the essential nature of the "profit" sharing scheme remained the same. In one email, when referring to compounding bids being renamed VIP bids, Wright-Olivares wrote, "wherever you see a (compounding) next to VIP – you will know that these terms are interchangeable," and she later wrote that "no change has been made in how they operate, qualify or earn." *Id*. at Ex. 18. Indeed, Wright-Olivares admitted that she thought the name changes were a joke. In a June 15, 2011 email to O.H. Brown, an RVG advisor whose company created marketing videos for ZeekRewards, about a company webinar script, she said: "you'll see where I started to say Retail Profit Pool (lol) instead of Compounder…. We're going to call compounding bids – VIP bids." *Id*. at Ex. 19.

Whether called the Compounder or the Retail Profit Pool, the program was a fraud because the payments had no relation to actual "retail" profits nor were they calculated from real receipts or expenses.  Instead, the alleged "profit percentage" was nothing more than an arbitrary number made up by Burks or one of the other Insiders. Most days, Burks made up the number. As Danny Olivares explained to RVG's internet provider, "Paul [Burks] goes in nightly and opens up adm_displayCompunder3.asp and enters a decimal percentage." Id. at Ex. 20. Sometimes, the number was made up by Dawn Wright-Olivares or Danny Olivares.

11

Rather than reflecting the typical variances that might be expected in a company's profits, the alleged profits paid in ZeekRewards were remarkably consistent, falling nearly always between 1% and 2% on Monday through Thursday and between .5% and 1% on the weekends, Friday through Sunday. The goal of this fake consistency was to project the appearance of a stable source of income to entice new participants and to encourage existing Affiliates to allow their bid balances to compound rather than request payment of their daily award in cash. And, with RVG's knowledge, Affiliates regularly touted the consistent payments in their recruiting of new participants. For example, "Coach Van's" email footer stated: "It has been going like clockwork for over 220 days, 7 days per week."…. "EVERYONE. . .GETS. . .PAID. . .FIRST. . .DAY!" . . . This works every time with just one minute per day! If you're not getting paid every single day for 1 minute of work, . . . [sic] why not?" . . . "100 percent of our active members are paid daily 100 percent of the time within their first 24 hours without any referrals." *Id*. at Ex. 21.

The payouts were so consistent that when a mistake was made (such as when an extra decimal place was added to the "profit" percentage or the lower "weekend" percentage was used on a "weekday") Affiliates would immediately complain. For example, on August 3, 2012, de Brantes sent Danny Olivares a Skype message saying, the "Thursday [RPP] commission's % are running like a weekend commission % and everyone is going crazy." *Id*. at Ex. 9(c). Olivares replies that, he is "working on it." *Id*.

And, the Insiders realized that not paying Affiliates, even once, was not an option if they wanted to keep the scheme going. On May 20, 2012, there were problems with payments to affiliates. Dawn Wright-Olivares texted Danny Olivares and instructed him to post an update letting affiliates know their payments would eventually be processed and commissions would be

paid, telling him, "[t]he fastest way to get charge [sic] as a Ponzi scheme is for distributors to claim they are not getting paid." *Id.* at Ex. 22.

Burks deliberately evaded affiliate questions asking how the RPP was calculated. In a Skype chat with an affiliate, he said: "[a] proprietary system is used to determine the amount of profit sharing that is done each day. We do not divulge the details of how those numbers are determined. Our stated target of minimum of 1% weekdays (Mon- Thur) and .5% weekends (Fri-Sun) has always been met and exceeded. It is clearly not directly tied to the number of auctions in a particular day. It is the overall average that counts." *Id.* at Ex. 9(d). Behind the scenes, the Insiders were not even subtle about the fake earnings numbers. Often, the company simply used the previous week's daily RPP percentages. For example, on one occasion, Danny Olivares sent a text message to multiple insiders stating, "Need a % for rpp when you can." Dawn Wright-Olivares responded, "Do whatever was last Monday." *Id.* at Ex. 40. Or, from Paul Burks: "Hey Dan. Sorry about last night. What percent did you use?" Danny Olivares: "Same as last Friday. 0.009." *Id.* at Ex. 23.

Sometimes, Burks even told Danny Olivares in advance what a day's profit number would be, such as on September 14, 2011, when in the early morning Burks told him "to start the RPP run shortly after 7p.m. using .00179 as the percentage" because Burks was not going to be able to run it himself. *Id.* at Ex. 24. Even if the Insiders had intended to calculate actual profits (which they plainly did not), RVG did not maintain financial records sufficient to allow Burks or anyone else to calculate a daily retail profit for the company. *See* Turner Report at 7 ("[T] there is no indication that the records existed that could calculate Zeek's daily profit.").

In an unsuccessful effort to avoid the obvious legal infirmity of Affiliates simply buying points in return for the expectation of a share of the profits (like a stock purchase), ZeekRewards

told Affiliates that in order to supposedly "earn" their points, they were required to place a short, free digital ad each day on one of the many free classified websites available on the internet. Affiliates were told to merely copy and paste free ads created by ZeekRewards into a free digital classified ad website. Bell Aff. at Ex. 25.

Affiliates then submitted the ad's internet link to ZeekRewards to verify that they had placed the ad. Placing more ads or better ads did not change an Affiliate's share of the profits in any way. And, the ad "requirement" was not imposed on all Affiliates. Burks even wrote a computer program that allowed a number of Affiliates who managed multiple accounts to avoid placing the ads altogether. As Burks wrote in an email to Danny Olivares on January 23, 2011, "This allows us to defer to some of our major people like Agnita Solomon who manage dozens of accounts so that they don'e [sic] have to place so many ads every day." *Id*. at Ex. 26.

The "ad" process was intended to be very simple and was widely advertised as taking only 3-5 minutes each day. For example, Burks routinely told Affiliates: "Placing an ad takes three to five minutes a day and can be done from anywhere there is an Internet connection." *Id*. at Ex. 27. The company did not believe that these digital ads made any material difference in the success of the Zeekler auctions and did no research to determine if the ads were successful. In reality, the ads were just an attempt to manufacture a cover for what was nothing more than the investment of money by Affiliates with the expectation of receiving daily "profit" distributions.

In a further effort to justify the Affiliates' investments of money, beginning in August 2011, ZeekRewards purportedly required Affiliates to "give away" their purchased VIP bids to earn points. *Id*. at Ex. 28, 29. The claimed intent of this "requirement" was to promote use of the auctions by new retail customers who received these free bids. However, Burks and the insiders

14

knew that in practice the bid "give away" program (like the free ads) had no material impact on
the success of the penny auctions.

First, the company made little or no attempt to determine if bids had in fact been given to
legitimate prospective retail customers. Many Affiliates simply listed fake email addresses,
addresses of other existing Affiliates or those planning to be affiliates, family members, and
other non-productive locations for where the bids had been given away. *Id*. at Ex. 30. In some
cases, the company just agreed not to require the affiliate to give away their bids to earn points.

Also, both as a way to minimize any real effort by Affiliates and a way to make more
money, Affiliates were given the opportunity to pay to have the company (supposedly) give the
bids away on behalf of the affiliate. *Id*. at Ex. 31. Points were earned when the bids were given to
the company (supposedly) to be given away. In fact, the company did not find prospective retail
customers to whom it could give away all the bids, so millions of bids remained in the company
unused. But, ZeekRewards did make an additional $2.00 - $2.50 per customer "sold" to
Affiliates. And, because there were alleged limits on the number of bids that could be given
away to any one person based on the Affiliate's membership level, tying the "give away" of bids
to the accrual of points drove "upgrades" in membership levels which increased revenues even
more. *Id*.

Danny Olivares explained the process of how VIP bids were automatically given away to
accrue points for Affiliates as follows: After a VIP bid is purchased, the "Company pool
automates the process of giving bids away as samples. Giving the bids away as samples is what
generates VIP points. Which the rpp uses to calculate your award. So we come full circle." *Id*. at
Ex. 32.

15

Burks told Affiliates that the company-wide Bid Pool would "take ALL of the sting out of the whole bid-give requirement! . . . [Y]ou will be able to automatically give your bids each day" and "you will automatically receive the VIP points as soon as you receive your daily RPP award each day. . . . All you'll have to do is select the "Give my bids to the Zeek bid pool" option and the system will automatically give your bids to your customers and every customer that registers @ Zeekler.com that wants free bids! If you do not have any customers then you simply purchase them as you need them from the customer co-op, and that will be automated as well!" *Id*. at Ex. 29.

Later, Affiliates were not allowed to simply pay the company to "give away" the bids for them, but they were allowed to pay third parties to do so. *Id.* at Ex. 33. Again, RVG made no effort to determine if these bids were in fact given to legitimate potential retail customers.

The second broad component of the ZeekRewards compensation plan was paying Affiliates to recruit other Affiliates in a pyramid-style payment system. ZeekRewards referred to this system as the "Matrix." The Matrix pyramid was initially a "2x21" matrix in which Affiliates made multi-level marketing commissions for 21 levels down in their "organization." *Id*. at Ex. 34, 35. Later, ZeekRewards used a "2x5 forced-fill matrix," which is a pyramid with 63 positions within the five levels (the number of persons doubles at each successive level). The scheme paid a bonus to Affiliates for every "downline" investor within each affiliate's personal matrix, plus a "matching bonus" for every 5th level where certain qualifiers were met. Therefore, commissions could be earned indefinitely as the pyramid expanded.

To get bonuses through the Matrix, Affiliates just had to (1) enroll in a monthly subscription plan requiring payments of $10, $50, or $99 per month; and (2) recruit at least two other "Preferred Customers" (i.e., investors who also enrolled in a monthly subscription plan).

16

*Id*. at Ex. 18. Once qualified, affiliates earned bonuses and commissions for every paid

subscription within their "downline" pyramid, whether or not they personally recruited everyone

within the matrix. Simply put, Affiliates were rewarded merely for recruiting new investors

without regard to any efforts by the Affiliates to sell bids or products or otherwise materially

support the Zeekler retail business.

      The funds raised through the Matrix were commingled with the money raised through the

Compounder / Retail Profit Pool (and what little money came in from the retail auction

business), so nearly all the money used to pay the pyramid commissions came from other

investors in the scheme. While some commissions were available to Affiliates on customers'

purchases of retail bids for use in the Zeekler auctions, Affiliates did not need to sell retail bids

to customers in order to receive commissions through the Matrix. Furthermore, overall

commissions from the sale of retail bids to end-user customers were miniscule (retail bids

accounted for only 1.1% of the money paid into the scheme). *See* Turner Report at 8. These retail

commissions, referred to by RVG as "Zap Commissions," were merely incidental to the overall

commissions earned through the Matrix for downline subscription payments and through the

Compounder/RPP.

      As with the Compounder, the Insiders changed the terminology for the Matrix, but they

never changed the real essence of the scheme. Dawn Wright-Olivares explained the cosmetic

changes to the Matrix this way: "you [will] in effect be paid on levels 5-10".... "but we can't

SAY that. Deep matrices get shut down. So instead...we say that you are getting a matching

bonus on all of the 2x5's on your 5th level. It's semantics, but semantics mean a great deal with

regulators." She went on, "[I] don't really understand how they can say they have levels 10, 15,

etc. when it's a 2x5, but if we can get away with it this way - then it's my vote to leave it alone."

17

Bell Aff. at Ex. 9(e). Similarly, Keith Laggos, a ZeekRewards advisor, emailed Dawn Wright-Olivares (copying Burks) in July 2011: "when talking about matching bonuses, you are showing being paid on 1 to 10, 1 to 15 and 1 to 20 levels. This defeats what we did by going to a 2x5 matrix. You should say a 100% matching on all your 5th, 15th and 20th level affiliates' 2 x 5 matrixes. I know you want to show they get paid on 20 levels in a 2 by 20 matrix, but that is when you can get a pyramid investigation or charge." *Id*. at Ex. 36.

RVG's insiders often worried about being caught and sought to make the unlawful scheme seem legitimate in many ways. As described above, the changing of terminology or the rules of the game, but not the substance of the scheme, was a common practice.

Throughout 2011 and 2012, Burks and the Insiders regularly changed the names of the program elements or demanded that Affiliates stop using certain words, which accurately described the scheme but highlighted its illegality. For example, on July 26, 2011, de Brantes emailed an Affiliate with a list of things the Affiliate can and cannot say, including: "compounder, compound, compounded, compounding, 125%, Members, Interest, Investment, Mature." On the list of sanitized things the Affiliate could say: "You make a purchase and re-purchase; You earn bids; The bids retire on a 90 day timeline averaging 1.5% a day; You get cash rewards; Retail Profit Pool; Everyone is an Affiliate and they own business center subscriptions; Your Bid balance can increase as oppose to mature." *Id*. at Ex. 37.

Also, RVG employees openly discussed the words that could and could not be used when promoting the scheme, even adding a bit of black humor as the scheme headed towards its inevitable demise. On June 8, 2012, de Brantes and others discussed "training" Affiliates on "the top 10 or 12 words that every Affiliate should erase from their vocabulary". The list included "investment, put money in, roi [return on investment], fund, passive income, passive returns,

returns and points are not dollars." In response to this list, Ken Kilby (a supposed "compliance officer") suggested adding: "BBB, Attorney General, FBI, FTC, Report, turn you in." *Id*. at Ex. 38.

Beyond the shifting terminology, Burks and the Insiders tried to bolster the perception of the legitimacy of the scheme by running "Compliance" courses for Affiliates. *Id*. at Ex. 39. As with the advertising or bid give-away "requirements," the "compliance" courses were just an effort to obscure the fraud and wrap it in a cloak of propriety, while making even more money in the process.

After an extensive investigation, the Receiver filed this action. The Complaint asserts claims for violation of the NCUFTA, Common Law Fraudulent Transfer and Constructive Trust. The Receiver seeks Judgment against each of the Named Defendants in the amount of their net winnings from the ZeekRewards scheme. With respect to the Net Winner Class, the Receiver seeks a Declaratory Judgment determining that the net winnings they received were fraudulent transfers from RVG that must be repaid to the Receiver and are subject to a constructive trust for the benefit of the Receivership Estate. Ultimately, the Receiver seeks a final Judgment against each Net Winner Class member in the amount determined to be their net winnings through a process to be set by the Court that provides class members the opportunity to respond to the Receiver's calculation of their net winnings.

## II.    DISCUSSION

Summary judgment should be granted where there is no genuine issue as to any material fact and the "movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party opposing summary judgment cannot rely on conclusory allegations, unsubstantiated assumptions or a scintilla of evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585-

86 (1986).  Rather, the non-moving party must "set out specific facts showing a genuine issue for

trial." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576

(4th Cir. 2010).

Despite engaging a defense expert to investigate the fundamental issue of whether or not

ZeekRewards operated as a Ponzi scheme, Defendants have conceded that ZeekRewards was, in

fact, a Ponzi scheme.  Nevertheless, Defendants argue that the Court should not grant summary

judgment in favor of the Receiver.  The Court will address each of Defendants' arguments

below.

Defendants first contend that a one-year limitations provision in ZeekRewards' website's

"Terms of Service" ("TOS") bars the Receiver's claims. The TOS provided:

> The TOS along with the Privacy Policy and Purchase/Membership/Affiliate
> agreement constitute the entire agreement between you and ZeekRewards and
> govern your use of the Service . . . You agree that regardless of any statute or law
> to the contrary, any claim or cause of action arising out of or related to use of the
> Service or the TOS must be filed within one (1) year after such claim or cause of
> action arose or be forever barred.

Doc. No. 135-2, p. 30.

Defendants' position is that because the Receiver stands in the shoes of RVG, he is bound by the

TOS and its limitations provision.  Essentially, Defendants are arguing that a subsequently

appointed receiver's fraudulent transfer claims can be barred by the terms under which the

scheme was implemented.

Contrary to Defendants' argument, a receiver is not bound by an agreement that the

fraudster, "acting with the intent to defraud, signed on behalf of" the company in receivership.

*See Hodgson v. Kottke Assocs., LLC*, Civ. Action No. 06-5040, 2007 WL 2234525, at *7 (E.D.

Pa. Aug. 1, 2007).  As is readily apparent, it "would create a perverse incentive . . . for a court to

rule that a party who fraudulently enters into an agreement subsequently bars a trustee or

20

receiver from bringing an action to recover the funds fraudulently transferred pursuant to that agreement." *Id*. If the terms implementing a fraudulent scheme could shorten the limitations period to eliminate or cut off a receiver's claims at an earlier date, a fraudster would have a strong incentive to include a limitations period much shorter than the statutory period (here one year instead of four) as a means to protect investors in his scheme from clawback actions down the road. Indeed, adopting Defendants' position would create a ready-made roadmap for fraudsters to protect anyone who won money in their scheme, thus further encouraging participation and enhancing the scheme. Such a result would undermine a receiver's ability to perform his duties and severely weaken his ability to serve his role as "an instrument of court . . . acting also for the stockholders of the corporation, and the creditors of the corporation." *Drennen v. S. States Fire Ins. Co.*, 252 F. 776, 787 (5th Cir. 1918). Accordingly, the Court finds that applicable statutory limitations periods apply in this case and the Receiver's claims are timely filed.

## A. Fraudulent Transfer Claims

The NCUFTA permits a receiver to avoid a transfer made "with the intent to hinder, delay, or defraud any creditor of the debtor" within four years after the transfer was made. *See* N.C. Gen. Stat. §§ 39- 23.4(a)(1) (fraudulent transfers); 39-23.1 (definitions); 39-23.9 (statute of limitations). Many courts have held that the intent to defraud can be presumed when transfers are in furtherance of a Ponzi scheme. The "Ponzi scheme presumption" has been long settled in a number of jurisdictions and under an analogous section of the Bankruptcy Code.

Bankruptcy Code Section 548(a)(1)(A) provides that a trustee may avoid a transfer of an interest of the debtor in property, if the debtor made such transfer with actual intent to hinder, delay, or defraud creditors. 11 U.S.C. § 548(a)(1)(A). A majority of federal courts have held that

21

proof of operation of a Ponzi scheme is sufficient to establish actual intent to hinder, delay, or defraud creditors to permit avoidance of a fraudulent transfer under section 548(a)(1)(A). *See*, *e.g.*, *Gold v. First Tenn. Bank, N.A. (In re: Taneja)*, No. 10-1225, 2012 Bankr. LEXIS 3554, *13-14 (E.D. Va. Jul. 30, 2012).   Transfers in furtherance of a Ponzi scheme "have achieved a special status in fraudulent transfer law" from which intent of actual fraud may be inferred. *In re Cohen*, 199 B.R. 709, 717 (9th Cir. BAP 1996).

Courts in the Receivership context outside bankruptcy also routinely apply the Ponzi scheme presumption to avoid fraudulent transfers. *Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014); *Wing v. Dockstader*, 482 Fed. App'x. 361, 363 (10th Cir. 2012);  *see also*, *Warfield v. Carnie*, No. 3:04-cv-0633, 2007 WL 1112591, at *9 (N.D. Tex. Apr. 13, 2007).

The U.S. Bankruptcy Court for the Middle District of North Carolina held that the "Ponzi scheme presumption" of actual fraudulent intent also arises in fraudulent transfer actions brought under N.C. Gen. Stat. § 39-23.4(a)(1). *Ivey v. Swofford (In re Whitley)*, 463 B.R. 775, 781 (Bankr. M.D.N.C. 2012). In reaching its conclusion, the court looked to the interpretation of the Uniform Fraudulent Transfer Act in other jurisdictions, as well as the relevant sections of the Bankruptcy Code. *See Id.* at 782 (citing *In re AFI Holding, Inc.*, 525 F.3d 700, 704 (9th Cir. 2008); *In re Mortg. Store, Inc*., Slip Copy, 2011 WL 3878355, at *2 (Bankr. D. Hawaii Sept. 1, 2011); *In re Dreier LLP*, 452 B.R. 391, 435 (Bankr. S.D.N.Y. 2011); *PHP Liquidating, LLC v. Robbins (In re PHP Healthcare Corp.)*, 128 Fed.App'x. 839, 847 (3d Cir. 2005); *ASARCO LLC v. Ams. Mining Corp*., 396 B.R. 278, 365 (S.D. Tex. 2008)).

There is no genuine issue of material fact that ZeekRewards operated as a Ponzi scheme. Accordingly, the law considers transfers from the scheme to be fraudulent transfers that may be avoided under the NCUFTA.

22

Defendants argue that regardless of whether RVG had bad intentions, summary judgment should be denied as to this claim because there is a genuine issue of material act as to whether the Defendants acted in good faith and provided "reasonably equivalent value" in return for their net winnings. [3]  Defendants argue that in exchange for the income they received from ZeekRewards, the evidence shows that they directed new customers to the Zeekler.com penny auction site, promoted the auction by placing daily advertisements on the internet, networked with other marketing professionals to gain greater exposure for Zeekler and ZeekRewards, set up websites to drive traffic to Zeekler and ZeekRewards, recruited new customers, and participated in training programs, leadership calls, and mandatory compliance programs.  They liken themselves to "internet marketing specialists" and contend that they provided more than reasonably equivalent value for the payments they received.

Actual participants and investors in a Ponzi scheme cannot establish that they gave "reasonably equivalent value" for their winnings through their efforts participating in and recruiting others to the scheme.  Nearly all the courts that have considered this issue have determined that participants and investors may be entitled to a return of their principal investment, but must return the amount received beyond that investment.  *See*, *e.g.*, *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) ("In the case of Ponzi schemes, the general rule is that a defrauded investor gives 'value' to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal."); *see also Wing*, 482 F. App'x at 365-66; *In re AFI Holding, Inc.*, 525 F.3d at 704; *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006); *Scholes v. Lehmann*, 56 F.3d 750, 757–58 (7th Cir. 1995).[4]  The Ninth

---

[3] N.C. Gen. Stat. § 39-23.8(a) provides an affirmative defense under the NCUFTA to a transferee who acted in good faith *and* provided reasonably equivalent value in exchange for the transfer.
[4] Despite Defendants' suggestion, there is no recent "trend" away from this rule.

23

Circuit has explained one rationale for this rule: "The policy justification is ratable distribution of remaining assets among all the defrauded investors. The 'winners' in the Ponzi scheme, even if innocent of any fraud themselves, should not be permitted to 'enjoy an advantage over later investors sucked into the Ponzi scheme who were not so lucky.'" *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) (quoting *In re United Energy Corp*., 944 F.2d 589, 596 (9th Cir. 1991)).

Moreover, courts have routinely and specifically held that there is no value in recruiting new investors to a fraudulent scheme. *See*, *e.g.*, *Wing v. Dockstader*, No. 2:08 CV 776, 2010 WL 5020959, at *6 (D. Utah Dec. 3, 2010) ("[T]he court disagrees with the notion that a person paid to refer investors to a ponzi scheme is more akin to the venture's utility provider than the investors."); *In re Nat'l Liquidators, Inc*., 232 B.R. 915, 919 (Bankr. S.D. Ohio 1998) ("The Trustee has established that the Debtor received less than a reasonably equivalent value, because all that the Debtor received in return for the transfers was the use of the Defendants' money to run the 'ponzi' scheme."); *In re Randy*, 189 B.R. 425, 438 (Bankr. N.D. Ill. 1995) (holding that "as a matter of law, when brokers are paid commissions for their efforts in promoting a Ponzi scheme, these commissions are fraudulent transfers").  The Fifth Circuit has aptly summarized the lack of merit in Defendants' argument, stating "[i]t takes cheek to contend that in exchange for the payments he received, the RDI Ponzi scheme benefited from his efforts to extend the fraud by securing new investments." *Warfield*, 436 F.3d at 560.

Moreover, the cases Defendants cite in support of their argument involve innocent trade creditors or third-parties providing "legitimate" services in the ordinary course of business. Defendants are actual participants/investors in the Ponzi scheme, not third-party service providers.

24

The Court finds that here is no genuine issue of material fact that Defendants did not provide "reasonably equivalent value" for their winnings.[5]  Accordingly, the Court grants summary judgment in favor of the Receiver on the NCUFTA claim.[6]

## B.  Constructive Trust Claim

The Receiver's final claim against the Defendants seeks the imposition of a constructive trust with respect to any transfer of funds, assets, or property from the Receivership Entities, as well as any assets later obtained by Defendants using the transferred funds.

> A constructive trust is a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust.

*Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744, 751–52 (N.C. 2012) (quoting *Wilson v. Crab Orchard Dev. Co.*, 171 S.E.2d 873, 882 (N.C. 1970)).

The Defendants argue that a constructive trust is only available when a fiduciary relationship exists and there is no adequate remedy at law.  They also contend that a constructive trust requires a traceable or identifiable *res*, and the Receiver bears the burden of proving traceability.

Citing *Variety Wholesalers,* the Receiver correctly points out that a fiduciary relationship is not required for imposition of a constructive trust.  All that is required under that decision for a

---

[5] Thus there is no reason for the Court to discuss the "good faith" argument of the Defendants, as the affirmative defense requires both good faith and reasonably equivalent value.

[6] In addition to seeking avoidance of fraudulent transfers pursuant to the "actual fraud" provision of the NCUFTA (N.C. Gen. Stat. § 39-23.4(a)(1)), the Receiver's First Claim for Relief also seeks avoidance pursuant to the "constructive fraud" provision of the statute (N.C. Gen. Stat. § 39-23.4 (a)(2)).  The Court finds it unnecessary to discuss this claim given the Court's holding that the transfers herein may be avoided pursuant to § 39-23.4(a)(1). Likewise, the Court finds it unnecessary to analyze the Receiver's alternative claim for common law fraudulent transfer.

25

constructive trust is an "inequit[y]" or "unconscientious matter." *Id.* at 752.  Here, the Ponzi scheme easily qualifies as inequitable and unconscientious.

Moreover, as this Court has previously noted, Defendants were early adopters of the ZeekRewards scheme and as result, these named Defendants may have already dissipated much of their net winnings. Without a constructive trust it would be impossible for the Receiver to trace and secure these fraudulently transferred Receivership Assets. Thus, the Receiver's remedy at law would be inadequate.

Finally, allowing the lack of traceability to defeat the Receiver's constructive trust claim would create a perverse incentive for every net winner of any Ponzi scheme to spend any proceeds received from the scheme before a receiver could start to unwind it and then claim that the assets were gone.  "In cases involving Ponzi schemes, courts have taken a broad view of the constructive trust remedy, and the tracing requirement, in order to effectuate the goal of returning to the victims of the fraud their stolen property or proceeds of that property." *S.E.C. v. Credit Bancorp, Ltd.*, 138 F. Supp. 2d 512, 533 (S.D.N.Y. 2001), *rev'd in part, vacated in part on other grounds*, 297 F.3d 127 (2d Cir. 2002). In *United States v. Benitez*, 779 F.2d 135 (2d Cir. 1985), for example, the Second Circuit held that a constructive trust could be imposed on the assets of a Ponzi scheme, even though those funds were "not traceable." *Id*. at 140; *see also United States v. Schwimmer*, 968 F.2d 1570, 1584 (2d Cir.1992) ("To the extent this Court tolerated a very relaxed tracing standard in *Benitez*, it was with an eye to permitting the District Court to exercise this general, victim-compensation function, without being hampered by strict definitions of property rights.").

Indeed, "[e]quity applies the principles of constructive trusts wherever it is necessary for the obtaining of complete justice . . .." *Speight v. Branch Banking & Trust Co.*, 83 S.E. 734, 736

(N.C. 1936).   Imposing a constructive trust under the circumstances herein furthers the

Receiver's ability to recover the assets of the ZeekRewards Ponzi scheme and distribute them to

the net losers, thus making the victims as whole as possible.   Accordingly, summary judgment in

favor of the Receiver is appropriate.

     IT IS THEREFORE ORDERED that the Receiver's Motion for Summary Judgment

Against Remaining Named Defendants is hereby GRANTED; and

     IT IS FURTHER ORDERED that the Receiver's Motion for Partial Summary Judgment

Against the Net Winner Class as to all liability issues is hereby GRANTED.

Signed:  November  29,

Graham C. Mullen
United States District Judge

27

**<u>Exhibit B</u>**

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

FILED
CHARLOTTE, NC

AUG 1 7 2012

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | Civil Action |
| | ) | No. 3:12 cv 519 |
| REX VENTURE GROUP, LLC d/b/a ZEEKREWARDS.COM, and PAUL R. BURKS, | ) | |
| | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission" or "SEC")

alleges as follows:

## SUMMARY OF ALLEGATIONS

1.     The Commission files this emergency action to halt the fraudulent

unregistered offer and sale of securities in an unregistered investment contracts

constituting securities in a combined  Ponzi and Pyramid scheme perpetrated by

Defendants Rex Venture Group, LLC ("Rex Venture") d/b/a

www.ZeekRewards.com ("ZeekRewards") and its principal, Paul Burks ("Burks")
(collectively "Defendants").

2.      Defendants solicit investors through the internet and over interstate
wires to participate in the ZeekRewards program, a self-described "affiliate
advertising division" for the companion website, www.zeekler.com ("Zeekler"),
through which Defendants operate penny auctions.

3.      Since approximately January 2011 through the present, the
Defendants have raised more than $600 million from approximately 1 million
investors nationwide and overseas by making unregistered offers and sales of
securities through the ZeekRewards website in the form of Premium Subscriptions
and VIP Bids.

4.      Unbeknownst to its investors, ZeekRewards is, in reality, a massive
Ponzi and pyramid scheme.

5.      Approximately 98% of ZeekRewards' total revenues, and
correspondingly the purported share of "net profits" paid to current investors, are
comprised of funds received from new investors.

6.      Defendants currently hold approximately $225 million in investor
funds in approximately 15 foreign and domestic financial institutions, and those
funds are at risk of imminent dissipation and depletion.

2

7.    Defendants have violated, and unless enjoined will continue to violate, the antifraud and securities registration provisions of the federal securities laws.  Unless restrained and enjoined, Defendants are likely to engage in future violations of the federal securities laws.  Accordingly, the Commission (A) seeks to preserve investor funds through an asset freeze, (B) seeks orders (i) for an accounting, (ii) prohibiting the destruction of documents and (iii) appointing a temporary receiver over the Defendants' assets; and (C) seeks preliminary and permanent injunctions, disgorgement with prejudgment interest, and civil penalties against each of the Defendants.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(l) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(l) & 77v(a)] and  Sections 21(d)(l), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(l), 78u(d)(3)(A), 78u(e) & 78aa].  Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

9.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act, 15 U.S.C.

§ 78aa, because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. Both Defendant Burks and Defendant Rex Venture d/b/a/ ZeekRewards transacted business, and offered and sold the securities that are the subject of this action, to investors in this district.

<b><u>DEFENDANTS</u></b>

10.    **Paul R. Burks**, age 65, is a resident of Lexington, North Carolina. Burks is the sole owner of Rex Venture Group, LLC, and exercises control over ZeekRewards, Zeekler, and other affiliated websites.

11.    **Rex Venture Group, LLC** ("Rex Venture") is a Nevada limited liability company with its principal place of business in Lexington, North Carolina. Rex Venture wholly owns and operates ZeekRewards, an internet website (www.zeekrewards.com) with physical operations in Lexington, North Carolina, and internet customers and contacts throughout the United States and internationally.

## FACTUAL ALLEGATIONS

### ORIGINS OF ZEEKREWARS

12.     Since 1997, Burks has operated through Rex Venture (and its corporate predecessor) several online, multi-level marketing businesses.

13.     In 2010, Burks created Zeekler.com, a penny auction website offering items ranging from personal electronics to cash.  Penny auctions require participants to pay a non-refundable fee to purchase and place each incremental bid (typically one cent) on merchandise sold via auction.  The penny auctions were not particularly successful until Burks launched ZeekRewards in January 2011.

14.     ZeekRewards is the self-described "private, invitation-only, affiliate advertising division" of Zeekler.  Bidders on Zeekler.com penny auctions can acquire bids by purchasing bids on Zeekler.com, but ZeekRewards and its affiliates also sell or give away free sample bids to be used in the penny auctions.

### THE ZEEKREWARDS OFFERING

15.     Through publicly available websites that Defendants own, operate, control, or sponsor, Defendants solicit persons to become investors or "affiliates" in ZeekRewards.

16.     Through the ZeekRewards program, Defendants offer affiliates several ways to earn money, two of which involve the offer and sale of securities in the form of investment contracts:  the "Retail Profit Pool" and the "Matrix."

17.    From at least January 2011 through the present, via the ZeekRewards website, Defendants have raised at least $600 million through the offer and sale of securities (via the Retail Profit Pool and the Matrix) to more than 1 million domestic and international investors.

18.    Defendants have not made any effort to determine if investors in fact have the financial wherewithal to invest, nor have they ever made any effort to determine if investors have any experience investing before investors commit any capital to ZeekRewards.

19.    No registration statement has been filed or has been in effect with the Commission in connection with the securities the Defendants are offering and selling, and have offered and sold.

### 1. THE RETAIL PROFIT POOL

20.    Defendants attracted new investors to ZeekRewards with the promise of daily profit-share awards distributed through a Retail Profit Pool, which operates as a Ponzi scheme. According to the ZeekRewards website, through the Retail Profit Pool the company shares "up to 50% of the daily net profits" with affiliates who meet certain qualifications ("Qualified Affiliates").

21.    To become a Qualified Affiliate, investors must satisfy four criteria: (i) enroll in a monthly subscription plan requiring payments of $10, $50, or $99 per month; (ii) enroll new penny auction customers personally, through the

6

ZeekRewards co-op program, or through third-party businesses endorsed by

ZeekRewards; (iii) sell at retail or purchase and give away as samples a minimum

of ten Zeekler.com bids, earning Profit Points; and (iv) place one free ad daily for

Zeekler.com and submit proof to ZeekRewards.

22.    The requirements to become a Qualified Affiliate constitute an

investment in a common enterprise and require little or no investor effort.

23.    Qualified Affiliates have no role in ZeekRewards' operations. The

Defendants alone created, update and operate the websites, handle all payments,

manage the bank accounts and payment service providers, manage affiliate and

customer accounts, manage all affiliate and customer services, oversee and

disburse all bids, operate the auctions, create all advertisements, sponsor recruiting

videos and calls, create the advertisements, and decide the daily payout

percentages for the Retail Profit Pool.

24.    Investor funds paid are pooled and comingled in a handful of financial

institutions. Investor funds also are commingled with ZeekRewards and the penny

auction website's overall revenues from all company operations.

25.    Qualified Affiliates earn Profit Points by either (a) selling penny

auction bid packages directly to retail customers ("Retail Bids"), or (b) purchasing

"VIP Bids" and giving them away as samples to retail customers or to other

personally-sponsored affiliates.

26.     Most affiliates opt to simply purchase VIP Bids (up to a maximum

$10,000 investment) and give them away as samples in order to earn Profit Points.

Even then, affiliates need not exert any efforts in giving away the VIP Bids they

purchase because Defendants have created automated programs, including the

"Customer Co-Op" and the "5CC" programs, that generate or have generated

purported customers to whom the bids can be given automatically without any

further effort on the affiliates' part.

27.     Earning daily dividends also requires that affiliates place one free

internet advertisement daily for the company, but that exercise requires little or no

effort.  Affiliates may merely copy and paste free ads – created by Defendants

without input from affiliates – from a company-sponsored program, which the

ZeekRewards website boasts should take no more than five minutes per day.

Affiliates also may employ a third-party program to generate ads automatically for

them; affiliates must simply verify that they've placed the ad by submitting an

internet link to ZeekRewards.  Placing more or better ads does not enhance an

individual's share of profits.

28.     Qualified Affiliates are paid their share of net profits from the Retail

Profit Pool in the form of daily "awards" or dividends on accumulated Profit

Points, which function like shares of stock.

29.     The size of the each Qualified Affiliate's daily award is dependent solely on how many Profit Points that investor has accumulated, and is not based on rendering any significant service to ZeekRewards. Thus, buying and giving away more VIP Bids earns greater Profit Points, hence a larger daily profit share award, without any additional effort required.

30.     Qualified Affiliates have the option to receive their daily "award" that typically has approximated 1.5% per day as: (i) a cash payment; (ii) additional Profit Points ; or (iii) a combination of both.

31.     ZeekRewards encourages Qualified Affiliates to convert at least 80% of their daily award as additional Profit Points. Most Qualified Affiliates follow this suggested approach.

32.     The daily award has a compounding effect for those Qualified Affiliates who elect to receive the daily award as new Profit Points rather than cash.

33.     As a result of the compounding effect, Qualified Affiliates now have nearly 3 billion Profit Points outstanding. Based on the ZeekRewards current outstanding Profit Point balance, the company would be obligated to pay out approximately $45 million per day if all Qualified Affiliates elected to receive their daily award in cash.

34.    Qualified Affiliates have no role in ZeekRewards' operations. The
Defendants alone created, update and operate the websites, handle all payments,
manage the bank accounts and payment service providers, manage affiliate and
customer accounts, oversee and disburse all bids, operate the auctions, manage the
Customer Co-Op, manage the 5CC program, create all advertisements, sponsor
recruiting videos and calls, create the advertisements, and decide the daily payout
percentages for the Retail Profit Pool.

35.    Investor funds paid in the form of subscription payments and
purchases of VIP Bids are pooled and commingled in a handful of financial
institutions.    Investor funds also are commingled with ZeekRewards and the penny
auction website's overall revenues from all company operations.

## 2. THE MATRIX

36.    ZeekRewards also employs a pyramid "Matrix" to reward its investors
for recruiting others to join the scheme. The company places each newly recruited
affiliate into a "2x5 forced-fill matrix," which is a multi-level marketing pyramid
with 63 positions that pools new investors' money and pays a bonus to affiliates
for every "downline" investor within each affiliate's personal matrix.

37.    Affiliates that have (i) enrolled in a monthly subscription plan
requiring payments of $10, $50, or $99 per month; and (ii) recruited at least two

other "Preferred Customers" (i.e., investors who have likewise enrolled in a monthly subscription plan) qualify to earn bonuses through the Matrix.

38.    Once qualified, an affiliate earns bonuses and commissions for every paid subscription within her downline 2x5 pyramid, whether or not she personally recruited everyone within the matrix.  Furthermore, affiliates are rewarded merely for recruiting new investors without regard to any efforts by the affiliates to sell bids or otherwise support the retail businesses.

39.    The Defendants, not the investors,  created, update, and operate the websites, handle all payments, manage the bank accounts and payment service providers, manage affiliate and customer accounts, create all advertisements, sponsor recruiting videos and calls, sponsor training videos and calls, and track and determine all Matrix bonus payments.

40.    Investor funds paid in the form of subscription payments are pooled and commingled in a handful of financial institutions along with all of Rex Venture's other revenues.

41.    Investors' Matrix bonuses and the Defendants' profits are both derived from the same source:  the overall revenues generated from new investors to the ZeekRewards program and the penny auction website.

### DEFENDANTS' OPERATION OF A FRAUDULENT PONZI AND PYRAMID SCHEME

42.    Defendants represent that through the Retail Profit Pool they will pay investors, or Qualified Affiliates, "up to 50%" of the company's daily net profits in the form of daily profit share awards.

43.    Burks is solely responsible for determining the amount of "net profits" to share in the Retail Profit Pool.

44.    Defendants represent that daily awards are calculated by dividing "up to 50%" of daily net profits by the number of Profit Points outstanding among all Qualified Affiliates.  This calculation results in a daily dividend paid to each Qualified Affiliate that consistently has averaged approximately 1.5% per day.

45.    In fact, the dividend bears no relation to the company's net profits. Instead, Burks unilaterally and arbitrarily determines the daily dividend rate so that it averages approximately 1.5% per day, giving investors the false impression that the business is profitable.

46.    Despite encouraging affiliates to purchase and give away VIP Bids to promote and drive traffic to the Zeekler penny auction website, Defendants fail to disclose that almost none of the VIP Bids given away by Qualified investors are actually used on the Zeekler penny auction website.  Of approximately 10 billion VIP Bids purchased by or awarded to investors, less than one-quarter of one

12

percent have been actually used in auctions on the Zeekler penny auction website.
Thus, the VIP Bids do little or nothing to actually promote the retail business.

47.    Moreover, Defendants fail to disclose that more than 90% of all
revenues (and hence net profits) are derived from new investor deposits (in the
form of VIP Bid purchases and subscription fees) rather than actual retail revenues.

48.    Defendants also fail to disclose that without new investor deposits (in
the form of VIP Bid purchases and subscription fees), revenues would dwindle
substantially as less than 10% of daily revenues come from actual retail sales, and
the scheme would likely collapse immediately.

49.    Based on the average 1.5% daily dividend on 3 billion Profit Points
outstanding, ZeekRewards would owe nearly $45 million per day in profit share
awards to investors – ZeekRewards Qualified Affiliates – if investors requested
cash rewards instead of points.  The company's actual daily revenues, which in
July 2012 averaged approximately $5 million per day, cannot support the daily
awards that have been consistently been "paid" or awarded at an average of
approximately 1.5% per day.

50.    Defendants fail to disclose to investors that the company would
quickly become insolvent if more Qualified Affiliates elected to take daily awards
in cash from the Retail Profit Pool rather than converting their awards into ever-
increasing accumulated Profit Points.

51.     Defendants also fail to inform investors of the substantial risk that the Matrix is prone to collapse if the promoters are unable to recruit ever-increasing numbers of paid affiliates into the Matrix pyramid, because without new investors there will be no source of revenue to pay existing participants in the scheme.

52.     Although to date ZeekRewards has paid out nearly $375 million to Qualified Affiliates through the Retail Profit Pool and the Matrix, the company has only approximately $225 million in deposits, which is insufficient to satisfy future awards based on outstanding Profit Points and Matrix commissions and bonuses.

### RISK OF FURTHER DISSIPATION OF INVESTOR FUNDS

53.     ZeekRewards' current investor payouts are approaching, and may soon exceed, total incoming revenue.  In July 2012, total revenue for ZeekRewards was approximately $162 million, while total investor cash pay-outs were approximately $160 million.  If more Qualified Affiliates in the Retail Profit Pool elect to receive cash payouts for daily awards rather than reinvestment into more VIP Points, ZeekRewards' cash outflows would eventually exceed total revenue.

54.     Burks has withdrawn approximately $11 million while operating Rex Venture and ZeekRewards, of which approximately $4 million remains in his possession, custody or control.

55.     Burks distributed approximately $1 million of the funds garnered from ZeekRewards to family members.

14

56.     Defendant Rex Venture currently hold approximately $225 million in investor funds in approximately 15 financial institutions.  These funds are in danger of rapid depletion.

57.     Approximately $40 million of those investor funds are held in the accounts of online payment service providers, of which approximately $30 million are held outside the United States.  The vast majority of these funds are being held by the payment processors as reserves against potential credit card "charge-backs" (i.e., claims for refunds for transactions involving fraud).

58.     The Retail Profit Pool's viability hinges on investors continuing to accept daily rewards in points instead of cash.  With approximately 3 billion VIP Points outstanding in the Retail Profit Pool, if Defendants continue to pay daily awards at their historical average rate of approximately 1.5%, and investors seek cash awards instead of points, investor claims for cash withdrawals could increase to approximately $45 million per day.  With only approximately $225 million on hand, the company would quickly be rendered insolvent.

## FIRST CLAIM FOR RELIEF

### UNREGISTERED OFFER AND SALE OF SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act

59.     The Commission realleges and incorporates by reference the foregoing paragraphs.

60.     Defendants, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

61.     No registration statement has been filed with the Commission or has been in effect with respect to any of the offerings or sales alleged herein.

62.     By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SECOND CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES

### Violations of Section 17(a) of the Securities Act

63.     The Commission realleges and incorporates by reference the foregoing paragraphs.

64.     Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

16

a.    with scienter, employed devices, schemes, or artifices to

defraud;

b.    obtained money or property by means of untrue statements of a

material fact or by omitting to state a material fact necessary in

order to make the statements made, in light of the

circumstances under which they were made, not misleading; or

c.    engaged in transactions, practices, or courses of business which

operated or would operate as a fraud or deceit upon the

purchaser.

65.    By engaging in the conduct described above, Defendants violated, and

unless restrained and enjoined will continue to violate, Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)].

## **THIRD CLAIM FOR RELIEF**

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

66.    The Commission realleges and incorporates by reference paragraphs 1

through 64 above.

67.    Defendants, and each of them, by engaging in the conduct described

above, directly or indirectly, in connection with the purchase or sale of a security,

17

by the use of means or instrumentalities of interstate commerce, of the mails, or of

the facilities of a national securities exchange, with scienter:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of a material fact or omitted to state a

        material fact necessary in order to make the statements made, in

        the light of the circumstances under which they were made, not

        misleading; or

    c.    engaged in acts, practices, or courses of business which

        operated or would operate as a fraud or deceit upon other

        persons.

68.    By engaging in the conduct described above, Defendants violated, and

unless restrained and enjoined will continue to violate, Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. §

240.10b-5].

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Securities and Exchange Commission respectfully

requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendants committed the

alleged violations described hereinabove.

## II.

Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d),

permanently enjoining Defendants and their officers, agents, servants, employees,

and attorneys, and those persons in active concert or participation with any of

them, who receive actual notice of the judgment by personal service or otherwise,

and each of them, from violating, directly or indirectly, Sections 5(a), 5(c) and

17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17

C.F.R. § 240.10b-5].

## III.

Issue, in a form consistent with Fed. R. Civ. P. 65, as to all Defendants, a

permanent injunction freezing the assets of Rex Venture and any entity affiliated

with it, directing that all financial or depository institutions comply with the

Court's Order, appointing a temporary receiver over the assets of Rex Venture,

prohibiting each of the Defendants from destroying documents, requiring

accountings from each of the Defendants, and ordering expedited discovery.

## IV.

Order that Defendants, and any employees or agents of Rex Venture, be

restrained and enjoined from destroying, removing, mutilating, altering,

concealing, or disposing of, in any manner, any of their books, records and

documents relating to the matters set forth in the Complaint, or the books, records and documents of any entities under their control, until further order of the Court.

## IV.

Order Rex Venture to disgorge all ill-gotten gains, including prejudgment interest, resulting from the illegal acts or courses of conduct alleged in this Complaint.

## V.

Order Burks to pay $4 million in civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.


Dated: August 17, 2012              Respectfully submitted,

John J. Bowers (NC Bar No. 23950)
Stephen L. Cohen
J. Lee Buck, II
Brian M. Privor
Alfred C. Tierney
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-xxxx
Telephone:  (202) 551-4645  (Bowers)
Facsimile:  (202) xxx-xxxx
*Email:  BowersJ@sec.gov*

Attorney for Plaintiff
Securities and Exchange Commission

21

**<u>Exhibit C</u>**

## BELL v. DISNER, Case No. 3:14-cv-91

## FINAL JUDGMENT

In accordance with the Court's Order Granting Entry of Final Judgment Against Certain Net Winner Class Members, Final Judgment is hereby entered against Defendant **LAI K HA** in the amount of **$78,382.12** which is comprised of $58,365.59 in net winnings from the ZeekRewards scheme and $20,016.53 in prejudgment interest. Post-judgment interest shall accrue on the total amount of this Judgment, including prejudgment interest, at the rate specified under 28 U.S.C. § 1961 from the date of entry of this Judgment until paid in full.

Certified to be a true and
correct copy of the original
U.S. District Court
Frank G. Johns, Clerk
Western District of N.C.
By: _____
Deputy Clerk
Date _7|15|2020_

**EXHIBIT A**

**<u>Exhibit D</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| MATTHEW E. ORSO, in his capacity as court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| TODD DISNER, in his individual capacity and in his capacity as trustee for Kestrel Spendthrift Trust; TRUDY GILMOND; TRUDY GILMOND, LLC; JERRY NAPIER; DARREN MILLER;  RHONDA GATES; DAVID SORRELLS; INNOVATION MARKETING, LLC; AARON ANDREWS; SHARA ANDREWS; GLOBAL INTERNET FORMULA, INC.; T. LEMONT SILVER; KAREN SILVER; MICHAEL VAN LEEUWEN; DURANT BROCKETT; DAVID KETTNER; MARY KETTNER; P.A.W.S. CAPITAL MANAGEMENT LLC; LORI JEAN WEBER; and a Defendant Class of Net Winners in ZEEKREWARDS.COM; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

No.

### ASSIGNMENT OF JUDGMENT

This ASSIGNMENT OF JUDGMENT (this "Assignment") is made
December, 2019, by Matthew E. Orso, solely in his capacity as court-app
Venture Group, LLC d/b/a ZeekRewards.com, ("Assignor") to Nationwid
Inc. (as the designee of Big Sky Research Bureau, Inc., the "Assignee") p
furtherance of, the arrangements provided for and in that certain Purchase
between Assignor and Assignee, dated as of May 30, 2019, as amended (
"Agreement").

**EXHIBIT E**

NOW THEREFORE, based on the foregoing and for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, transfers and assigns to Assignee, in respect of the above captioned proceedings, all rights and interests of Assignor in and to those certain Judgments entered in the above referenced action at docket number 179, including each of the individual judgments referenced on docket number 179-2, without recourse, representation or warranty, except as provided for in the Agreement.

THE SALES, TRANSFERS AND ASSIGNMENTS PROVIDED FOR HEREIN ARE EXPRESSLY SUBJECT, IN ALL RESPECTS, TO THE TERMS AND PROVISIONS OF THE AGREEMENT, WHICH ARE INCORPORATED HEREIN BY THIS REFERENCE.

This Assignment shall be governed by, and construed in accordance with, the laws of the State of North Carolina.

IN WITNESS WHEREOF, Assignor has executed this Assignment effective as of December 16, 2019.

Assignor:

Matthew E. Orso, not individually, but solely in his capacity as court-appointed Receiver for Rex Venture Group, LLC dba ZeekRewards.com and its Estate

STATE OF North Carolina

COUNTY OF Mecklenburg

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document:

Matthew E. Orso.

(name(s) of principal(s))

Date: December 16, 2019

Joan C. Bartley

Notary Public
Print Name: Joan C. Bartley

My commission expires: April 28, 2022

Joan C. Bartley
Notary Public
Mecklenburg County, NC
My Commission Expires Apr. 28, 2022

**EXHIBIT E**